Robert J. COLONNA

v.

Mary M. COLONNA.

Superior Court of Pennsylvania.

Argued Aug. 2, 2001.
Filed Dec. 28, 2001.

William J. Helzlsouer, Dravosburg, for Mary Colonna.

Chris F. Gillotti, Pittsburgh, for Robert Colonna.

Before CAVANAUGH, EAKIN and JOYCE, JJ.

EAKIN, J.:

¶ 1 Mary M. Colonna (Wife) appeals the order of June 30, 2000, distributing the parties' property pursuant to her antenuptial agreement with Robert J. Colonna (Husband). Husband's cross appeal challenges various credits issued to Wife.

¶ 2 The parties executed an antenuptial agreement August 16, 1983, and were married August 29, 1983. The agreement limited both parties' interest in property pre-viously owned by the other and property acquired in individual names during the marriage. If the parties divorced, the agreement divided all joint property equally and limited the alimony and counsel fees Wife could collect.

¶ 3 The agreement was tested in 1996, when Husband filed a declaratory judgment action, and a divorce complaint. Wife filed a response claiming the agreement was unenforceable because Husband failed to fully and fairly disclose the value of his business. The divorce was final March 19, 1999; the trial court retained jurisdiction over the economic issues.

¶ 4 The trial court found the agreement was enforceable, and awarded the Woodstown Road residence and the Stahlstown Farm property to Wife, as these properties were solely in her name. The court required Husband to pay her $441,196, representing half the joint mortgage debt encumbering these two properties and various other credits. The court divided the Foster Plaza property equally; Husband received the property itself, but was ordered to pay Wife half its net value. The court denied alimony, alimony pendente lite, and counsel fees, except as set forth in the agreement. The appeals of Husband and Wife followed.

¶ 5 Wife frames the following questions:
1. Did the [trial] court err in enforcing the antenuptial agreement when: 1. Wife's expert ... established that the disclosures in the schedules attached to the antenuptial agreement were meaningless; 2. the [trial] court found as a matter of law in response to Husband's Motion for Compulsory Nonsuit, that Wife had rebutted the presumption of validity by clear and convincing evidence; 3. Husband's expert witness, in rebuttal, established that Husband's business, which was listed as being

worth between 2 and 13 million [dollars] with a listed value of 6 million, was worth less than 2 million, a disparity of 4 million dollars; 4. the agreement did not have full and fair disclosure of statutory rights; and 5. the agreement did not disclose Husband's income?

2. Did the [trial] court err in denying wife's Petition to Open Case ... to introduce into evidence a[l]etter dated August 30, 1983 prepared by Husband, balance sheets of Husband (March, 1983 through December, 1983) proffered by Husband in connection with Wife's alimony/APL and counsel fee request?

3. Did the [trial] [c]ourt err in not finding that the antenuptial agreement, executed by the parties thirteen days prior to the marriage, was under all the circumstances unconscionable and therefore unenforceable?

Wife's Brief, at 5.

¶ 6 Husband presents the following questions:

1. Did the trial court err in ordering Husband to pay one-half of the mortgage balances on the Woodland Road property and the Stahlstown property?

2. Did the trial court err in adopting the court-appointed expert's opinion on the fair market value of the Foster Plaza property without adjusting the value to reflect the actual remediation costs necessary to repair the exterior wall of the property?

3. Did the trial court err in ordering Husband to pay interest on the net amount due Wife while failing to award Husband interest on his credits?

Husband's Brief, at 10.

¶ 7 Exiting the marital stage is more painful than curtain time on opening night; prenuptial agreements seek to minimize the aggravation at the end of the marital drama. Neither side is satisfied here with the court's ruling, often the mark of a sound result. Our review, however, can be concerned only with ensuring the correct application of the law, and as we have stated before: "Our standard of review is a narrow one—is there an abuse of discretion in what was done? Was there an error in the law's application, or is this appeal mere financial frustration?" *Busch v. Busch,* 732 A.2d 1274, 1276 (Pa.Super.1999) (citation omitted).

■ ¶ 8 In order for an antenuptial agreement to be enforceable, the parties must make a full and fair disclosure of their financial positions. *Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162, 167 (1990) (citation omitted). The disclosure must be full and fair, as the parties stand in a relation of mutual confidence and trust, but it need not be exact. *Id.* **A presumption of full and fair disclosure applies if the agreement provides full disclosure has been made; one may rebut the presumption by clear and convincing evidence of fraud or misrepresentation.** *Id.*

¶ 9 In the agreement, Husband valued his business at $6 million, but explained this estimate was the average of a low of $2 million and a high of $13 million. A subsequent appraisal found it to have been worth less than $2 million in 1983. Wife calls this "the overvaluation conundrum", and argues it rendered the agreement unenforceable due to a lack of full and fair disclosure.

¶ 10 The logic of the "conundrum" is as follows: if it is less than full and fair disclosure to undervalue one's assets, it must be equally unfair to overvalue them. This has a simple allure, but mistakenly equates "inaccurate" with "unfair". Wife tells us what is allegedly inaccurate, but fails to tell us what was unfair about the disclosure. She does not suggest this conundrum induced her to enter into either the contract or the marriage, and absent such an inducement, her claim lacks merit.

¶ 11 Unfairness involves a detriment to the deceived; Wife offers us no specifics of how overvaluation caused her any harm, and we see none inherent in this "conundrum". Husband stands accused of telling her he was worth more than he actually was. If she is correct, he was not hiding assets, but was inflating his worth. Overstating one's worth would cause the other party to demand more in the agreement, not less; i.e., if he purports to be worth more, she would bargain for more. Disclosing a lesser value would suggest only a smaller pie to share.

¶ 12 Not surprisingly, we find no Pennsylvania statutory or case law declaring that overvaluing a closely-held business may render an antenuptial agreement unenforceable. The valuation of a closely-held corporation is not an exact science; reasonable minds often disagree on the worth of such a business, and the agreement evidences just that: Innovative Systems was listed as having a value of $6,000,000, with a footnote which explained:

Dun & Bradstreet offered ten times 18 present pre-tax earnings and ten times 19 pre-tax in three years.

| | |
|---|---|
| ISI earnings last 12 months — | $400,000 — $4,000,000 |
| Earnings in three years estimated — | 900,000 — 9,000,000 |
| Citibank and American Express made inquiries. Competitive firm sold at 27 times after tax estimated after earnings $(196 \times 27 = 5,292)$ | $5,292,000 |

If firm was being positioned for sale another $100,000 in earnings could be generated. The lowest pre-tax multiple seen so far is 5 for a software company. The value would be $2,000,000.

Value is between $2,000,000 and $13,000,000, depending on value of technology to acquiring firm. $6,000,000 is shown on the balance sheet.

■ ¶ 13 This clearly satisfies the full and fair disclosure requirement in *Simeone*. **Husband's disclosure gave Wife enough information; she could investigate further had she any doubts as to what was on the table. We find no harm, and we find no error.**

■ ¶ 14 Wife petitioned to reopen the case to introduce a letter and balance sheets to show this overvaluation. The trial court reasoned that any overvaluation of Husband's net worth did not prejudice her. "The general rule is that 'a court may, in its discretion, reopen the case after

a party has closed for the taking of additional testimony, but such matters are peculiarly within the sound discretion of the trial court. . . .' ''*In re J.E.F.*, 487 Pa. 455, 409 A.2d 1165, 1166 (1979) (citations omitted). Because valuation did not induce Wife to enter the marriage or the agreement, the letter could not void the agreement. As this letter would not change the outcome, we find no abuse of discretion in refusing to reopen the case.

 ¶ 15 Wife also argues the agreement is unconscionable because it was unreasonably favorable to Husband, the drafter. In order "for a court to deem a contractual provision unconscionable it must determine both 'that the contractual terms are unreasonably favorable to the drafter' and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions." *Todd Heller Inc. v. United Parcel Service Inc.*, 754 A.2d 689, 701 (Pa.Super.2000) (citation omitted). Wife fails, however, to show both parties were not of equal bargaining power. We have found the parties made a full and fair disclosure of their financial positions. Whether the agreement was favorable to one party or another in 1996 is not the issue. As appropriate disclosure was made, we do not find the agreement unconscionable.

 ¶ 16 In part four of her first claim, Wife asserts the agreement is invalid for lack of full and fair disclosure of her statutory rights. Absent material misrepresentation or fraud, a reviewing court is prohibited from inquiring "into whether [the] parties had attained informed understandings of the rights they were surrendering[,]" when determining the enforcement of marriage settlement agreements. *Simeone*, at 166–167.[1] Therefore, Wife's contention she was not fully aware of her statutory rights prior to signing the antenuptial agreement is baseless.

 ¶ 17 Additionally, we do not reach Wife's argument the agreement must be set aside because it does not spell out Husband's income. She does not support this issue at all in her brief. Our research discloses no case requiring current incomes as a specific, required disclosure element. Having failed to develop this issue in her brief, Wife's argument is therefore waived. *Glynn v. Glynn*, 2001 WL 1602753 (Pa.Super. Dec.17, 2001).

¶ 18 Husband argues the mortgages on the Woodland Road property and the Stahlstown Farm property should be assigned to Wife because the titles to these properties are in her name alone. Wife claims these mortgages are business debts of Husband and he should be responsible for them. The trial court reasoned that although these properties were titled in Wife's name alone, the mortgages were joint, making each responsible for 50% of the mortgage debt.

¶ 19 The agreement does not apportion debt, resulting in another conundrum for this Court. Mortgages are mentioned but

---

1. Given the clear language of *Simeone*, the decisions of this Court, e.g., *Ebersole v. Ebersole*, 713 A.2d 103 (Pa.Super.1998), which suggest that relinquishment of statutory rights must be based upon an informed understanding of those rights, are incorrectly decided and of no precedential authority. Where the highest appellate court in our Commonwealth has spoken on an issue, reliance on later, conflicting decisions of this Court is improper. *See Commonwealth v. Randolph*, 553 Pa. 224, 718 A.2d 1242, 1245 (1998).

briefly in the agreement: either party could encumber their own property, and the other agreed to join in a mortgage if required by the lender. Restated, each party agreed to cooperate in the other's encumbering of their own property. Looking at this plan, we see the requirement to join a mortgage as a marital accommodation to facilitate getting a loan; such a mortgage may be an obligation the bank can enforce, but it is not an agreement to undertake an obligation to the other party for half the debt.

■ ¶ 20 The agreement did not appear to contemplate distributing debt, joint or otherwise, yet it clearly contemplated that mortgages were likely. We can only conclude the intent was to "net out" the properties encumbered by that debt. That is, the debt follows the property, regardless of the names on the mortgage. This explains the requirement each join the other's mortgage, and the absence of provisions assigning it separate from the property encumbered.

¶ 21 The trial court treated each mortgage the same; each was in both names, and both parties were assessed half of each obligation. It is difficult to fault consistent treatment, but the flaw lies in the fact the agreement deals with distribution of property, not the liens encumbering that property. By treating each mortgage the same, the court ended up treating each property differently.

¶ 22 The Foster Plaza property was jointly titled, and the court gave each party half the net value. We find no error in this. The other two properties were not "netted out"; Wife was awarded the full value and Husband was ordered to pay her half the encumbering debt.

¶ 23 It is true these two were in Wife's name alone, unlike the Foster Plaza property, but the agreement contains no provision authorizing the division of mortgages on property held by only one party. Debt is not "titled", as the court suggested. The presence of both names reflects each party's obligation to the lender of 100% of the debt (not 50% each as the court suggests), but it does not reflect any agreement between Husband and Wife to pay for mortgages on each other's property.

¶ 24 Distribution made pursuant to the same agreement must be consistent. As the trial court reasoned, Husband and Wife were each entitled to half of the *net* value of the Foster Plaza property, the same analysis has to be applied to the Woodland Road and Stahlstown Farm properties. Since Wife has sole ownership of these properties, she should receive all of the *net* value of these properties after subtraction of the mortgage debt. Accordingly, we must reverse and remand to the trial court for a recalculation.

■ ¶ 25 We next consider whether the trial court erred in adopting the court-appointed expert's opinion on the fair market value of the Foster Plaza property. Husband contends the appraisal offered by Charles Weisberg did not adjust for the costs of certain repairs made after the 1997 appraisal. The trial court adopted Weisberg's valuation because it was based on what a hypothetical buyer would have paid in 1997, the time the property was transferred to Husband; since the repairs were not made at the time of transfer, they were not included in the valuation. We find no abuse of discretion in declining to reduce Wife's share based on repairs made after the property was out of her name.

¶ 26 Husband's final issue concerns interest he was ordered to pay Wife on the amount due her. At first glance, Husband has a valid argument with respect to interest when the Stahlstown and West Woodland Road properties were to be distribut-

ed in gross. Based on our decision to remand and require the trial court to treat these properties as it treated the Foster Plaza Property, Husband's credit issue essentially dissipates.

¶ 27 Reversed in part, affirmed in part; case remanded. Jurisdiction relinquished.