**Michael G. SABAD, Appellant**

**v.**

**Elizabeth A. FESSENDEN, Appellee**

**Michael G. SABAD, Appellee**

**v.**

**Elizabeth A. FESSENDEN, Appellant**

Superior Court of Pennsylvania.

Argued Jan. 15, 2003.
Filed May 22, 2003.

Mark R. Galzerano, Alquippa, for Sabad.

Lori K. Doerr, Butler, for Fessenden.

Before: DEL SOLE, P.J.,
MUSMANNO, and KELLY, JJ.

KELLY, J.:

¶ 1 In this opinion, we are called upon to determine whether the parties' antenuptial agreement was valid and enforceable under the law of New York and Pennsylvania, whether the agreement was an effective waiver of rights to alimony, whether the agreement provided full and fair disclosure of the parties' assets and set forth the parties' statutory rights, whether the agreement's enforceability was limited to testamentary disposition, and whether a party can effectively waive rights to the equitable distribution of the marital portion of pension plans which are subject to ERISA.[1] We conclude that the parties' agreement was valid and enforceable under the law of New York and Pennsylvania, that it was not an effective waiver of the parties' rights to alimony, that it provided full and fair disclosure, that it was intended to address the treatment of the parties' respective property both during

---

1. Employee Retirement Income Security Act of 1974, § 2 *et seq.*, 29 U.S.C.A. § 1001 *et seq.*

their lifetime and upon their death, and that it represented an effective waiver of their rights to equitable distribution of the marital portion of their pension plans that are subject to ERISA. Accordingly, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

¶ 2 The relevant facts and procedural history of this case, gleaned from the record, are as follows. Appellant, Michael G. Sabad ("Husband"), and Appellee, Elizabeth A. Fessenden ("Wife"), lived together in New York for approximately six years prior to their marriage on February 8, 1991. This was the second marriage for both parties; Husband had one child from his first marriage. On January 30, 1991, the parties entered into an antenuptial agreement, drafted by a New York attorney, while both were residents of New York. In 1998, the parties moved to Tennessee and then to Pennsylvania, where they separated in 2000. Husband filed a complaint in divorce on July 17, 2000, seeking equitable distribution, spousal support, alimony *pendente lite,* alimony, attorney's fees, costs and expenses. Wife filed an answer and counterclaim, raising the issue of equitable distribution and exclusive possession of the marital residence. The parties were eventually divorced on January 19, 2001, without prejudice to the parties' other claims. Since the parties' separation, Husband has relocated to Santa Claus, Indiana and Wife has relocated back to New York, New York.

¶ 3 On March 13, 2001, Wife filed a motion for special relief, asserting that "after the filing of Inventory & Appraisement forms by both parties, it is clear that [there] exists a dispute as to the interpretation of the language of the parties' Antenuptial Agreement, since former Wife excludes all of each part[y's] separately owned assets from 'marital property,' and former Husband includes all assets no matter when acquired or how titled, in the definition of 'marital property.'" (Motion for Special Relief, filed 3/13/01, at 1). On April 2, 2001, Husband filed his Answer to Wife's motion and a request for declaratory judgment, stating: "[T]he document which purports to be an Antenuptial Agreement is void for divorce purposes, is unenforceable except for testamentary disposition purposes, and is not applicable to the Parties' divorce case according to Pennsylvania case law." (Answer and Motion for Declaratory Judgment, filed 4/2/01, at 2).

¶ 4 On August 8, 2001, the court ordered the parties to file briefs on the issue of whether New York law or Pennsylvania law should be applied to the interpretation of the January 30, 1991 antenuptial agreement. Having reviewed the parties' briefs, the court entered an order on October 31, 2001, which stated that the issue of the validity of the agreement would be determined under New York law and all other issues regarding the agreement's interpretation would be determined under Pennsylvania law. On January 30, 2002, the court took testimony regarding the validity and the effect of the parties' agreement.[2] Following the hearing, the court reviewed new briefs on the matter and on May 24, 2002, entered its findings of fact and conclusions of law on the record. Therein, the court stated that the January 30, 1991 agreement was valid and binding, and an effective antenuptial waiver of rights in equitable distribution and alimony, except as to equitable distribution of the marital portion of the parties' pension plans, which are subject to ERISA. On June 20, 2002, Husband filed timely notice of appeal with this Court from the May 24, 2002 order;

2. Husband failed to appear and/or testify at    the hearing.

on July 2, 2002, Wife filed notice of cross-appeal.

¶ 5 On appeal at No. 1111 WDA 2002, Husband presents the following questions for our consideration:

DID THE TRIAL COURT ERR WHEN IT FOUND THAT THE ANTENUPTIAL AGREEMENT BETWEEN THE PARTIES WAS A VALID, BINDING AND ENFORCEABLE AGREEMENT UNDER NEW YORK AND PENNSYLVANIA LAW?

DID THE TRIAL COURT ERR WHEN IT FOUND THAT THE AGREEMENT WAS AN EFFECTIVE WAIVER OF RIGHTS TO ALIMONY?

DID THE TRIAL COURT ERR WHEN IT FOUND THAT THE AGREEMENT PROVIDED FULL AND FAIR DISCLOSURE OF THE PARTIES' ASSETS AND FINANCIAL CONDITIONS AND THAT THE AGREEMENT SET FORTH THE STATUTORY RIGHTS WHICH THE PARTIES WERE RELINQUISHING BY SIGNING THE AGREEMENTS?

DID THE TRIAL COURT ERR WHEN IT DID NOT LIMIT THE AGREEMENT'S ENFORCEABILITY TO ISSUES CONCERNING TESTAMENTARY DISPOSITION ONLY?

(Husband's Brief at 4).

¶ 6 On cross-appeal at No. 1141 WDA 2002, Wife proposes the following issue for our review:

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY FINDING THAT THE AGREEMENT WAS NOT AN EFFECTIVE WAIVER AS TO THE EQUITABLE DISTRIBUTION OF THE "MARITAL" PORTION OF PENSION PLANS THAT ARE SUBJECT TO ERISA?

(Wife's Brief at 4).

¶ 7 "The determination of marital property rights through prenuptial, postnuptial and settlement agreements has long been permitted, and even encouraged." *Laudig v. Laudig,* 425 Pa.Super. 228, 624 A.2d 651, 653 (1993). Where a prenuptial agreement between the parties purports to settle, fully discharge, and satisfy any and all interests, rights, or claims each party might have to the property or estate of the other, a court's order upholding the agreement in divorce proceedings is subject to an abuse of discretion or error of law standard of review. *See Busch v. Busch,* 732 A.2d 1274, 1276 (Pa.Super.1999), *appeal denied,* 563 Pa. 681, 760 A.2d 850 (2000) (citing *Laudig, supra*). An abuse of discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures. *Paulone v. Paulone,* 437 Pa.Super. 130, 649 A.2d 691 (1994). We will not usurp the trial court's fact-finding function. *Laudig, supra.*

¶ 8 In his first issue, Husband asserts that the parties' antenuptial agreement is not valid under New York law because it is manifestly unfair to Husband. Husband argues that the terms of the agreement are unconscionable. Husband maintains that there was no full and fair disclosure of the parties' assets. Husband complains that the agreement failed to set forth the statutory rights the parties were relinquishing by signing the agreement. Husband indicates that he was not represented when he signed the agreement. Husband also complains that the agreement failed to provide for a division of property in the event of divorce. Husband states that the agreement failed to provide any guidance in the event of divorce because "there is no mention in the agreement of the words divorce, separation, property distribution, alimony, alimony *pendente lite,* maintenance, spousal support, counsel fees, costs

or any other claims which are usually involved in a divorce action." (Husband's Brief at 16). Further, Husband complains the agreement does not state what happens to the increase in value of the "separate property" of the parties. Husband concludes, therefore, the trial court erred when it found that the antenuptial agreement between the parties was a valid agreement under New York law and enforceable under Pennsylvania law. We disagree.

¶ 9 With regard to the issue of whether New York or Pennsylvania law should apply to the question of the validity of the antenuptial agreement, the trial court reasoned in its October 31, 2001 opinion as follows:

In *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), the Pennsylvania Supreme Court adopted the principles of the Restatement of Conflicts Second to address conflict of law questions. The general provisions concerning choice of law are set forth in Section 6 of the Restatement and the more specific provisions regarding contracts are set forth in Section 188. The beginning point of our analysis is the fact that Pennsylvania has no statutory directive concerning the choice of law on these issues. This being the case the general principles involved are set forth in Section 6(2). Applicable to this situation is 2(d) "the protection of justified expectations." It can be reasonably inferred that the alleged agreement was entered in contemplation of marriage which occurred in New York State on February 8, 1991, some five days after the agreement. Parties do not enter contracts with the expectation that they are invalid or void. They are entered with an anticipation of a valid enforceable agreement. It is reasonable to anticipate that [Husband] and [Wife] in this case intended their agreement to be valid. In further analysis of this situation we looked to Section 188. It is our conclusion that of the factors set forth in Section 188, New York State has the most significant contacts. It is the place of contracting, the place of negotiation, one of the many places which parties in the position of these parties could have anticipated performance. We note that at the time of the filing of this Divorce Decree the parties had substantial assets in both New York State and Pennsylvania.

[Husband] counters that the issue of validity of an agreement is determined by the state which has entered a Divorce Decree. For this proposition [Husband] relies upon *Gillan v. Gillan*, 236 Pa.Super. 147, 345 A.2d 742 (1975). In *Gillan* the Superior Court applying principles from the Restatement of Conflicts Second held that a determination of the validity of a separation agreement which survived the parties' New York Divorce Decree was to be determined by New York State law where the Decree was entered. [Husband's] reliance on the principle of *Gillan* is misplaced. In that case the Defendant sought to have the contract declared void as being collusive. Noting that a determination of collusion could attack the propriety or validity of the New York State Divorce Decree was the basis of the decision of the Superior Court in applying New York law to the issue of validity of the contracting question. This differs significantly from the issue at hand. Whether or not the 1991 agreement is void or voidable for lack of fair and full disclosure at the time of entry will have no effect upon the integrity of the January 2001 Divorce Decree entered by our Court. We conclude that the most significant contacts concerning the validity of the agreement entered in January of 1991 in New York

are with the State of New York and that its law will apply to this issue.

(Trial Court Opinion, filed October 31, 2001, at 3–4; R.R. at 103a–104a). We agree with the trial court's reasoning and adopt it as our own. Moreover, our research regarding the factors that, pursuant to New York law, determine the validity of an antenuptial agreement reveals:

> An antenuptial agreement is valid and enforceable if it is in writing, subscribed by the parties, and acknowledged or proven in a manner required to record a deed. A duly executed agreement is provided the same presumption of legality as any other contract.

*Goldfarb v. Goldfarb,* 231 A.D.2d 491, 647 N.Y.S.2d 243, 244 (1996) (internal citations omitted); *Edmonds v. Edmonds,* 184 Misc.2d 928, 710 N.Y.S.2d 765 (2000). Here, the terms of the agreement were reduced to a written instrument. Both Husband and Wife signed the agreement and had their signatures notarized. Thus, the agreement is presumptively valid under New York law. *See Goldfarb, supra.*

¶ 10 As to interpretation, enforcement, and remedies, in Pennsylvania, antenuptial agreements are interpreted in accordance with traditional principles of contract law. *Mormello v. Mormello,* 452 Pa.Super. 590, 682 A.2d 824, 826 (1996) (quoting *Cooper v. Oakes,* 427 Pa.Super. 430, 629 A.2d 944, 946 (1993);[3] *Simeone v. Simeone,* 525 Pa. 392, 400, 581 A.2d 162, 165 (1990)). Generally, the parties are bound by their agreements, absent fraud, misrepresentation or duress. *Id.* They are bound "without regard to whether the terms were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." *Id.*

¶ 11 When interpreting an antenuptial agreement, the court must determine the intention of the parties. *Raiken v. Mellon,* 399 Pa.Super. 192, 582 A.2d 11, 13 (1990) (citing *Laub v. Laub,* 351 Pa.Super. 110, 505 A.2d 290, 293 (1986)). "When the words of a contract are clear and unambiguous, the intent of the parties is to be discovered from the express language of the agreement." *Id.* "Where ambiguity exists, however, the courts are free to construe the terms against the drafter and to consider extrinsic evidence in so doing." *Id.* (citing *Rusiski v. Pribonic,* 511 Pa. 383, 515 A.2d 507 (1986)).

¶ 12 In the instant case, on January 30, 2002, the court heard evidence to determine the intent of the parties as to the meaning of the antenuptial agreement. Husband failed to appear and testify at the hearing. Wife testified with regard to her intent with regard to the agreement as follows:

> [Wife's Attorney]: Did you have a prenuptial or antenuptial agreement with your first husband?
>
> [Wife]: No, I did not.
>
> Q: With respect to your finances and assets, what impact, if any, did the process of going through that first divorce have on your decision to marry Mr. Sabad?
>
> A: The first divorce was very emotional and there was some haggling over assets. And in the course of that divorce proceeding I became aware that as the spouse with fewer assets I potentially had a claim on some of the assets of my first husband that I would never have thought I would have earned such as his ownership in the company business and his pension. And I didn't take any claim to those. But it made me

---

**3.** Disapproved of on other grounds by *Stoner v. Stoner,* 572 Pa. 665, 819 A.2d 529 (2003).

aware in my second marriage where I had significantly more assets than Mike that I should protect my assets with a prenuptial agreement. And there was also the reason that Mike had previously been married and divorced and had a daughter. And that his ex-wife was routinely having support action taken on him. And we both felt that it was important that my income and my assets be separated from his so that she would not have a claim on those in the actions for supports (sic) for [his daughter].

\* \* \* \* \* \*

Q: 1986, I'm sorry. And when Mr. Cappella presented this agreement to you, what did you understand this agreement to mean?

A: I read it, and what would be page one, there is a clause that describes that property would be separately owned and would remain in the name of the owner. This would apply while Mike and I were married as well as in the event of a divorce. So, this protected my assets, which was one of the intentions of the prenup for me. And then the other thing it did in clause two said that in the event of death, that there was (sic) some options in terms of how we handle the estate.

Q: And in conversations with Mr. Sabad you had contemporaneous with the signing of this agreement, did he express his understanding in the event of divorce that you would each retain your separately acquired assets whether acquired prior to or during the marriage?

A: Yes, he understood that was one of the purposes of this prenup.

Q: And within the past month or couple of weeks, did you have the opportunity to have a conversation with Mr. Sabad regarding this agreement?

A: Yes.

Q: And can you briefly describe the content of that conversation?

A: Well, there was (sic) several conversations. I think I will just kind of tell you how it went. I hadn't seen Mike other than in this courtroom over a year ago until two weeks ago when I was checking into a hotel here in Pittsburgh. Apparently, he was there on business as well. He ran into me in the lobby. We spoke there briefly. And even in that short conversation he mentioned that, you know, he had been thinking of calling. He was sorry for what he had done. Asked me to go to dinner with him. I declined. Later that evening when I returned to my room, there was a message from him. I did return his call. And there had been——it was that call and several others over the course of the last two weeks where he has proposed getting together so that he could attempt to reconcile with me. And I have stated clearly to him that that's something that just had not crossed my mind. That all my energy related to our relationship at this point is dealing with trying to protect my assets as he and I had agreed. And that I felt all his treatment and behavior was punitive, and there was no way I could consider a reconciliation while I was viewing all his actions as being punitive. No matter what his words were they didn't mean anything to me. During one of his conversations we did discuss how we had handled our assets and finances, and I said Mike, you had agreed that we would keep things in our own names separate and that they would not transfer to each other, and he said, right.

(Hearing, 1/30/02, at 4–5, 19–22; R.R. at 109a–110a, 124a–127a) (emphasis added). On cross-examination, Wife explained further:

[Husband's Attorney]: Okay. You stated that when you signed this agreement that there was a paragraph, and it does speak for itself, that says, and I'm just going to read it, after the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property. Now, what was your understanding of what your own property meant?

[Wife]: My understanding would be any asset, real property, savings accounts, vehicles, anything that has a legal name attached to it that would have my name on it, that's my property, whether it be a 401(k), income, anything that has my name associated with it. Typical understanding. I would use the word asset for property.

Q: Okay. And the agreement goes on to say that each of you shall have the absolute and unrestricted right to dispose of such separate property, correct?

A: Uh-huh.

Q: Now, this is what concerns me. I'm speed [reading] this clause. It says, separate property. I'm wondering if it's clear from this agreement what the two of you meant when you said separate property when you signed this. What was your intention as far as what was separate property?

A: Separate would be property that has my name only or his name only. There would be joint property would have both names which at the time, for example, was the apartment building.

Q: Now, would that also be true if a court would consider property which is in an individual name not separate property, for instance under a Divorce Code?

A: I think you are—separate property, you asked me how I interpreted this. Anything that had my name on it would remain mine and I could choose to so what I wanted with it in marriage, divorce, at any time. He could do the same.

Q: Now, that would also include then a pension, correct?

A: Right. My pension was my pension. He was earning a pension. I was earning a pension. They were separate.

(*Id.* at 35–37, 515 A.2d 507; R.R. at 140a–142a). Thus, Wife explained her intent in having the agreement drafted. Husband failed to appear and testify at the hearing. The trial court found Wife credible. As a result, the trial court found that (1) Wife wanted to be sure that her assets and income would not affect Husband's child support obligation and that (2) Husband acknowledged in a telephone conversation with Wife several weeks prior to the hearing that he understood the antenuptial agreement dealt with property rights in divorce. (*See* Findings of Fact, Conclusions, and Order of Court, filed May 24, 2002, at 2–3; R.R. at 41–42). We will not usurp the trial court's fact-finding function. *See Laudig, supra.* We conclude Husband's claims are meritless.[4]

¶ 13 Husband's second issue is an assertion that the agreement does not waive claims for alimony. In fact, Husband asserts that the agreement did not contain any mention of waiver of alimony. Wife supports Husband's claim in this instance. Thus, the parties agree that the trial court erred when it found that the antenuptial agreement was an effective waiver of alimony rights.

---

**4.** As to the myriad of equitable claims in Husband's first issue, he fails to develop how the antenuptial agreement was manifestly unfair, inequitable, unconscionable, lacking in full and fair disclosure, etc. Accordingly, we will not provide these matters any more attention. *See* Pa.R.A.P. 2119(a) (mandating inclusion of discussion and citation to pertinent authorities in argument section of brief).

¶ 14 After careful review of the parties' antenuptial agreement, we conclude that the trial court erred when it determined that the agreement was an effective waiver of alimony rights. The agreement does not mention waiver of alimony, the parties agree that they did not intend that the agreement should waive alimony rights, and we cannot approve the trial court extending the agreement to include such waiver. *See Raiken, supra.* Therefore, we reverse and remand as to this issue.

¶ 15 In his third issue, Husband asserts that the parties' antenuptial agreement did not provide full and fair disclosure. Citing *In re Estate of Geyer*, 516 Pa. 492, 533 A.2d 423 (1987),[5] *Adams v. Adams*, 414 Pa.Super. 634, 607 A.2d 1116 (1992), *appeal denied*, 533 Pa. 617, 619 A.2d 699 (1993),[6] and *Ebersole v. Ebersole*, 713 A.2d 103 (Pa.Super.1998), *appeal denied*, 559 Pa. 678, 739 A.2d 543 (1999),[7] Husband also complains that the agreement failed to set forth the statutory rights the parties were relinquishing by signing the agreement. Husband maintains that the agreement was unconscionable, manifestly unfair, and consequently unenforceable. Therefore, Husband concludes that the trial court erred when it found the agreement was enforceable. We disagree.

¶ 16 In Pennsylvania:

Full and fair disclosure of the financial positions of the parties is required. Absent this disclosure, a material misrepresentation in the inducement for entering a [antenuptial] agreement may be asserted.... It is well settled that this disclosure need not be exact, so long as it is 'full and fair'. In essence therefore, the duty of disclosure under these circumstances is consistent with traditional principles of contract law.... If an agreement provides that full disclosure has been made, a presumption of full disclosure arises. If a spouse attempts to rebut this presumption through an assertion of fraud or misrepresentation then this presumption can be rebutted if it is proven by clear and convincing evidence.

*Mormello, supra* at 827 (quoting *Cooper, supra* at 947 (quoting *Simeone, supra* at 402, 581 A.2d at 167)) (internal citations omitted). *See In Re Estate of Blumenthal*, 812 A.2d 1279, 1286 (Pa.Super.2002); *Colonna v. Colonna*, 791 A.2d 353, 355 (Pa.Super.2001), *appeal denied*, 569 Pa. 690, 803 A.2d 732 (2002). It is not necessary to reduce to writing the parties' respective financial disclosures. *See In Re Estate of Hartman*, 399 Pa.Super. 386, 582 A.2d 648, 651 (1990), *appeal denied*, 527 Pa. 634, 592 A.2d 1302 (1991) (citing *Nigro v. Nigro*, 371 Pa.Super. 625, 538 A.2d 910 (1988); *In Re Hillegass Estate*, 431 Pa. 144, 244 A.2d 672 (1968)) (stating Pennsylvania cases have found adequate disclosure of assets without their reduction to writing). Further, the *Simeone* Court held: "To impose a *per se* requirement that parties entering a prenuptial agreement must obtain independent legal counsel would be contrary to traditional principles of contract law, and would constitute a paternalistic and unwarranted interference with the parties' freedom to enter contracts." *Simeone, supra* at 400, 581 A.2d at 166.

¶ 17 Instantly, the antenuptial agreement specifically states:

WHEREAS, each of the parties owns individually real estate and personal

---

5. Abrogated by *Simeone, supra.*

6. Disapproved of by *Stoner, supra;* distinguished by *Mormello, supra.*

7. Disapproved of by *Stoner, supra;* abrogated by *Colonna v. Colonna*, 791 A.2d 353 (Pa.Super.2001); distinguished by *Busch v. Busch*, 732 A.2d 1274 (Pa.Super.1999).

property, the nature and extent of the holdings of each party having been disclosed to the other. . . .

(Antenuptial Agreement at 1; R.R. at 48a) (emphasis added). Thus, there is a presumption of full and fair disclosure. *See Mormello, supra.* We conclude that Husband has failed to rebut the presumption by proving fraud or misrepresentation with clear and convincing evidence. Therefore, the trial court properly found full and fair disclosure.

¶ 18 As to Husband's complaint that the agreement failed to set forth the statutory rights the parties were relinquishing when signing the agreement, our Supreme Court has recently held in *Stoner, supra:*

> [T]he requirement that a party be made aware of his or her statutory rights, set forth by the plurality in [*In re Estate of*] *Geyer,* has never been adopted by a majority of this court, and we decline to do so here. . . . [W]e endorse the parties' rights to freely contract, and thus decline to impose the additional inquiry as to whether the parties were sufficiently advised of their statutory rights. . . . [W]e recognize in *Simeone* that "[p]arties to these agreements do not quite deal at arm's length, but rather at the time the contract is entered into stand in a relation of mutual confidence and trust that calls for disclosure of their financial resources." In light of this unique relationship, we affirm the principle in *Simeone* that full disclosure of the parties' financial resources is a mandatory requirement. This requisite acknowledges that the parties stand in a closer relationship beyond that of professional acquaintances negotiating a commercial contract. However, for the reasons expressed above, we do not find that the spousal relationship warrants the extra requirement that the parties be advised of their statutory rights. Rather, we

find that the right balance is struck by requiring full disclosure of financial assets, in conjunction with the protection of traditional contract remedies for fraud, misrepresentation or duress.

> Therefore, we hold that a spouse may enforce a[n antenuptial] agreement without having to demonstrate that statutory rights have been disclosed, either in the [antenuptial] agreement itself or through other evidence. To the extent that the Superior Court decisions in *Ebersole, Mormello,* and *Adams* hold otherwise, they are disapproved.

*Id.,* at 672–73, 819 A.2d at 533. Thus, we conclude that Husband's issue regarding the disclosure of the parties' statutory rights is without merit.

¶ 19 In his fourth issue, Husband asserts that the parties' antenuptial agreement pertained solely to the disposition of the parties' property after death. Husband argues that the agreement addresses only the waiver of estate rights. Husband indicates that the agreement states:

> WHEREAS, the parties desire that all property now owned or hereafter acquired by each of them shall, for testamentary disposition, be free from any claim of the other that may arise by reason of their contemplated marriage. . . .

(*Id.*) Husband claims that the agreement fails to mention what should happen in the event of a divorce and therefore should not be applicable to the instant situation. Husband concludes that the trial court erred when it did not limit the antenuptial agreement's enforceability to issues concerning testamentary disposition only. We disagree.

¶ 20 In the instant case, at the January 30, 2002 hearing, Wife attested to the parties' intent in creating the antenuptial agreement, which was not limited to testamentary disposition. (*See* Hearing at 4–5, 19–22, 35–37; R.R. at 109a–110a, 124a–

127a, 140a–142a). In addition, we note that the first numbered paragraph of the agreement addresses only "property to be separately owned" as follows:

> After the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, whether now owned or hereafter acquired, and each of them shall have the absolute and unrestricted right to dispose of such separate property, free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.

(*Id.* at 1–2; R.R. at 48a–49a). Thus, we conclude that the agreement was intended to address the treatment of the parties' respective property both during their lifetime and upon their death.

¶ 21 Next, we examine Wife's issue on cross-appeal. Wife asserts that although ERISA has strict provisions as to who may waive rights to the survivor benefits of a pension, the spousal benefit waivers in the antenuptial agreement pertain only to the parties' rights to the equitable distribution of the other's pension. Therefore, Wife concludes that the trial court abused its discretion when it held that the parties' antenuptial agreement was not an effective waiver of the parties' rights to equitable distribution of the marital portion of the pension plans that are subject to ERISA. We agree.

¶ 22 Regarding ERISA and its requirement of joint and survivor annuity, Section 1055 of Title 29 of the United States Code Annotated provides:

§ 1055. Requirement of joint and survivor annuity and preretirement survivor annuity

(a) Required contents for applicable plans

Each pension plan to which this section applies shall provide that—

(1) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity, and

(2) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.

\* \* \* \* \* \*

(c) Plans meeting requirements of section

(1) A plan meets the requirements of this section only if—

(A) under the plan, each participant—

(i) may elect at any time during the applicable election period to waive the qualified joint and survivor annuity form of benefit or the qualified preretirement survivor annuity form of benefit (or both), and

(ii) may revoke such election at any time during the applicable election period, and

(B) the plan meets the requirements of paragraphs (2), (3), and (4).

(2) Each plan shall provide that an election under paragraph (1)(A)(i) shall not take effect unless—

(A)(i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of

such election and is witnessed by a plan representative or a notary public, or

(B) it is established to the satisfaction of a plan representative that the consent required under subparagraph (A) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Secretary of the Treasury may by regulations prescribe.

Any consent by a spouse (or establishment that the consent of a spouse may not be obtained) under the preceding sentence shall be effective only with respect to such spouse.

\*     \*     \*     \*     \*     \*

29 U.S.C.A. § 1055(a), (c). In addition, Section 1056 addresses the form and payment of benefits as follows:

§ 1056.   Form and payment of benefits

\*     \*     \*     \*     \*     \*

(d) Assignment or alienation of plan benefits

(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

(2) For the purposes of paragraph (1) of this subsection, there shall not be taken into account any voluntary and revocable assignment of [benefits] not to exceed 10 percent of any benefit payment, or of any irrevocable assignment or alienation of benefits executed before September 2, 1974. The preceding sentence shall not apply to any assignment or alienation made for the purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if such loan is secured by the participant's accrued non-forfeitable benefit and is exempt from the tax imposed by section 4975 of Title 26 (relating to tax on prohibited transactions) by reason of section 4975(d)(1) of Title 26.

(3)(A) Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

(B) For purposes of this paragraph—

(i) the term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

\*     \*     \*     \*     \*     \*

29 U.S.C. § 1056(d).

¶ 23 Whether a party can effectively waive rights to the equitable distribution

of the marital portion of pension plans subject to ERISA appears to be one of first impression in Pennsylvania. Thus, we will examine the case law of some of our sister states for guidance.

¶ 24 In *Edmonds v. Edmonds*, 184 Misc.2d 928, 710 N.Y.S.2d 765 (2000), the parties entered into an antenuptial agreement two days prior to their marriage.[8] The agreement provided that each party would have the exclusive right to dispose of any and all property of whatever nature which he or she "now owns or is possessed of, or may hereafter acquire, or receive, as his or her own absolute property in like manner as if he or she had remained unmarried." It also provided that any property acquired in their joint names after the marriage would be divided equally between the parties in the event of a divorce. The parties waived their rights to equitable distribution and their right to temporary or permanent alimony or maintenance in the event of a divorce. Defendant-husband had been represented by counsel and plaintiff-wife, although aware of her entitlement, waived representation. At the time the agreement was executed, wife was employed by Bell Atlantic and had accrued a pension. Wife remained with Bell Atlantic, with her pension increasing in value during the marriage. She also participated in a retirement and savings plan through her employer. Wife eventually filed for divorce. Husband sought a determination that wife's pension and deferred compensation plan are marital assets subject to equitable distribution. The court concluded that husband waived his interest in wife's pension by a valid prenuptial agreement and that such pension was therefore not subject to equitable distribution, reasoning:

> ERISA (29 USC § *et seq.*) was enacted in 1974. Effective January 1, 1985 the Retirement Equity Act of 1984[REA] added to the statute the requirement that all qualified pension plans provide automatic benefits to surviving spouses in the form of a survivor's annuity (Pub.L. No. 98–397, 98 U.S.Stat. 1429 [1984]). Pursuant to REA, retirement income and deferred compensation plans must provide survivor benefits in the form of joint and survivor annuities to the spouses of participants (29 USC § 1055[a][2]). These mandated benefits provide income to the surviving spouse in the event of the death of the participant, regardless of whether the death occurs before or after retirement. In addition to mandating the survivor benefits, REA provides that such benefits cannot be waived by the participant or spouse unless, *inter alia,* the waiver is written, signed by the participant and his or her spouse before a plan representative or a notary, and designates a beneficiary who cannot be changed without spousal consent (29 USC § 1055[c][1], [2]).
>
> Apart from the survivor benefit of REA, ERISA does not mandate that other benefits be provided to a participant's spouse. In fact, ERISA expressly prohibits alienation of benefits by the plan participant, except by a Qualified Domestic Relations Order (QDRO) issued by a state court in a matrimonial action under the State's domestic relations law (29 USC § 1056[d]). ERISA creates no substantive rights in the case of divorce, but only accommodates, by the provisions governing QDRO's, rights created by state matrimonial law. In New York, vested or matured rights in a pension plan are considered marital property subject to distribution in a divorce action to the extent that the benefits result

---

8. The parties were married on September 17, 1982, and they have three children.

from employment by the participant after the marriage and before the commencement of the divorce action (*Majauskas v. Majauskas,* 61 N.Y.2d 481, 474 N.Y.S.2d 699, 463 N.E.2d 15 [1984] ). There is nothing in the matrimonial law of New York prohibiting a spouse from waiving his or her interest in such marital property by agreement made before or during the marriage in accordance with Domestic Relations Law 236(B)(3).

\* \* \* \* \* \*

The spousal rights under ERISA do not survive a judgment of divorce (*Kahn v. Kahn,* 801 F.Supp. 1237, 1243, *affd.* 2nd Cir., 2 F.3d 403 [1993] ), and once a divorce is granted, the survivorship benefits are moot.

\* \* \* \* \* \*

Only two courts have addressed this issue in New York, and they have reached opposite conclusions. In *Moor–Jankowski v. Moor–Jankowski,* 222 A.D.2d 422, 634 N.Y.S.2d 728 [1995] plaintiff sought equitable distribution of defendant's retirement benefits even though the parties had entered into an antenuptial agreement wherein each waived any interest he or she might acquire in the other's property by reason of the marriage. The Second Department affirmed Supreme Court's dismissal of plaintiff's claim to the retirement benefits, holding that plaintiff waived any interest in the pension by the antenuptial agreement and that ERISA did not prohibit such waiver. In *Richards v. Richards,* 232 A.D.2d 303, 648 N.Y.S.2d 589 [1996] the First Department affirmed Supreme Court's holding that plaintiff was not barred from equitable distribution of defendant's pension by a prenuptial agreement in which she waived any right thereto. Citing *Hurwitz v. Sher,* 789 F.Supp. 134 [ (1992), *cert. denied,* 508 U.S. 912, 113 S.Ct.

2345, 124 L.Ed.2d 255 (1993) ], the court held that under ERISA, "only a spouse can waive spousal rights to employee plan benefits" (*Richards v. Richards, supra* at 303, 648 N.Y.S.2d 589) and that such rights cannot be waived in a prenuptial agreement.

The court in *Richards v. Richards, supra,* failed to perceive that "spousal rights" under ERISA are limited to survivor benefits, and the statutory restrictions upon the waiver of such rights are likewise limited to survivor benefits. The better view, as taken by the court in *Moor–Jankowski v. Moor–Jankowski,* 222 A.D.2d 422, 634 N.Y.S.2d 728 [1995], is that ERISA's restriction on the waiver of survivor benefits does not apply to the waiver of an interest in a spouse's pension as that interest is recognized in *Majauskas v. Majauskas, supra.* In *In re Marriage of Rahn,* 914 P.2d 463 [Colo.App.1995], where the facts are similar to those in the instant case the court said "[w]hile we recognize that a waiver of spousal death benefits in a prenuptial agreement is not effective when the spouse later dies while the parties are still married, ERISA does not, in our view, preempt or preclude the recognition, implementation, or enforcement of an otherwise valid prenuptial agreement with regard to, as here, a dissolution of marriage proceeding." (*Id.* at 468).

*Id.* at 930–33, 710 N.Y.S.2d at 768–70.

¶ 25 In *Stewart v. Stewart,* 141 N.C.App. 236, 541 S.E.2d 209 (2000), the parties signed a written premarital agreement on June 25, 1992. The parties separated in January 1998. In February 1998, plaintiff-wife brought an action seeking spousal support, alimony and equitable distribution. Defendant-husband pled that the terms of the agreement barred wife's claims. The parties did not dispute the

existence or validity of the agreement. On July 2, 1999, the trial court granted summary judgment in favor of husband on wife's claims for spousal support and alimony. The court also granted partial summary judgment in favor of husband on wife's claims for equitable distribution of certain property excluded by the terms of the agreement, specifically the parties' respective retirement accounts and the husband's interest in a medical clinic. Wife appealed the July 2, 1999 judgment. The North Carolina Appellate Court found the reasoning of *Moor–Jankowski, Edmonds,* and *In re Rahn* persuasive, determining that the spousal benefit waiver requirements outlined in 29 U.S.C. § 1055(c)(2) are limited to survivor benefits and do not apply to a waiver of an interest in a spouse's pension plan as such interest arises under state law. *Stewart, supra* at 246, 541 S.E.2d at 216. The court then concluded that the unambiguous language of the parties' agreement provided that the parties' retirement accounts were to remain their separate property and that the waiver was valid under North Carolina state law as well as ERISA. *Id.* at 247, 541 S.E.2d at 216.

¶ 26 The instant case is similar to *Edmonds, supra* and *Stewart, supra.* Here, Husband and Wife signed and had notarized a written antenuptial agreement, which purported to waive any interest either party might ordinarily acquire in the other's property by virtue of the marriage. The parties employed unambiguous language in their agreement providing that the property they had or would acquire was to remain their separate property. The parties retained their absolute and unrestricted right to dispose of their separate property. Included in that waiver were Husband's and/or Wife's rights to

pension benefits that could eventually be considered marital property. Having carefully considered the reasoning and outcome in the preceding cases in light of the facts of the instant case, we conclude that the parties' agreement represented an effective waiver of their rights to equitable distribution of the marital portion of their pension plans that are subject to ERISA.

¶ 27 Based upon the foregoing, we hold that the parties' agreement was valid and enforceable under the law of New York and Pennsylvania, that it was not an effective waiver of the parties' rights to alimony, that it provided full and fair disclosure of the parties' assets, that it was intended to address the treatment of the parties' respective property both during their lifetime and upon their death, and that it represented an effective waiver of their rights to equitable distribution of the marital portion of their pension plans that are subject to ERISA. Therefore, we reverse that portion of the trial court order that states:

> except as to equitable distribution of the marital portion of pension plans of the parties to this proceeding which are subject to ERISA and the regulations promulgated thereunder.

(Order, 5/24/02).[9] We also reverse as to that portion of the order that dealt with the waiver of rights to alimony; we affirm as to all other parts of the trial court's order.

¶ 28 Order affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

---

9. We recognize that the waiver did not extend to their respective survivor benefits under ERISA, because the parties were not married when the antenuptial agreement was created.