ESTATE OF Terry L. KENDALL, Deceased.

**Appeal of Susan L. Kendall.**

Superior Court of Pennsylvania.

Argued June 23, 2009.
Filed Sept. 15, 2009.

---

Ann C. Lebowitz, Philadelphia and James P. Mannion, King of Prussia, for appellant.

Vincent V. Carissimi, Philadelphia and Mason Avrigian, Blue Bell, for Participating Parties.

BEFORE: FORD ELLIOTT, P.J., BENDER and GANTMAN, JJ.

OPINION BY BENDER, J.:

¶ 1 Susan L. Kendall appeals from the order entered by the orphans' court on November 14, 2008, that granted the motion for summary judgment filed by PNC Bank, N.A., executor of the Estate of Terry L. Kendall, deceased, and denied Susan's cross motion for summary judgment. The order also granted PNC's petition for declaratory judgment, providing that Susan's interest in the Estate was to be determined by a formula interpreting subparagraph G.(1) of Susan's and Terry's

prenuptial agreement.[1] We affirm.[2]

¶ 2 Susan and Terry were married on February 1, 1994, and the marriage continued until the time of Terry's death on June 20, 2005. Terry had been previously married and had two children, Jennifer Kendall and Bryan Kendall, with his former wife. Prior to Susan's and Terry's marriage, they entered into a prenuptial agreement that contains the following pertinent paragraph:

> G.(1) If Terry predeceases Susan and at the time of Terry's death there has been no Separation, then Terry shall provide by Will, Codicil, joint ownership of property or otherwise for Susan to receive Property with a value at the time of Terry's death equal to at least One Hundred Percent (100%) of the value of all Marital Property reduced by the amount of Marital Debt, said Property passing to Susan to bear its proportionate share of estate taxes as hereinafter provided.... If Terry shall fail to make the provision contained in this Subparagraph, Susan shall be entitled to receive the Property described in this Subparagraph from Terry's estate.

Prenuptial Agreement, at ¶ G.(1). The prenuptial agreement also contains the following definitions of "Property," "Separate Property" and "Marital Property":

> (2) "Property" means real and personal property, of every kind, tangible and intangible, wherever situated.
>
> (3) "Separate Property" means:
>
> > (a) Property acquired by Susan or Terry, as the case may be, before

the Marriage, including, but not limited to, any interests in retirement, pension and/or profit sharing plans;

> (b) Property acquired by Susan or Terry, as the case may be, during the Marriage by bequest, devise, descent or gift from anyone, including interspousal gifts from Terry to Susan or from Susan to Terry;
>
> (c) any increase in the value of any Property referred to in (a) or (b);
>
> (d) the proceeds of any disposition of any property referred to in (a), (b) or (c), howsoever held, invested or reinvested; and
>
> (e) any increase in the value of any Property referred to in (d); and
>
> (f) as to Terry, his interests as of December 31, 1993 in CD Alternatives of America, Inc. and CDA, Inc. (hereinafter referred to collectively as "CDA, Inc."), said interests having a value on December 31, 1993 of $350,000. For purposes of this Agreement, said value of $350,000 shall be deemed to be the value of CDA, Inc. as of the date of the Marriage.

(4) "Marital Property" means all Property acquired by either or both of Susan and Terry during their Marriage and before the Separation, as hereinafter defined, including without limitation, any increase in the value of the Property described in Subparagraph 3.(f) of this Paragraph A. over the value set forth in

---

1. The order further provided that any interested party would not be precluded from challenging the values of assets and liabilities PNC determined in connection with the formula proposed by PNC and adopted by the orphans' court.

2. Upon certification by the orphans' court judge and pursuant to Pa.R.A.P. 342 ("Or-

phans' Court Orders Appealable"), which provides for the appealability of orphans' court orders that determine "an interest in realty, personalty, the status of individuals or entities or an order of distribution not final under other provisions of the Rules," *In re Estate of Sorber,* 803 A.2d 767, 768 (Pa.Super.2002), this appeal is properly before us.

said Subparagraph, and specifically excluding the Property described in Paragraph A.(3) of this Agreement.

Prenuptial Agreement, at ¶ A.(2), (3) and (4).

¶ 3 Terry's will, which he executed on February 23, 2005, provided the following designated gifts:

I. *Personal and Household Effects:* I give all my articles personal or household use, including automobiles, together with all insurance relating thereto, to my wife, SUSAN L. KENDALL, if she survives me.....

II. *Pre-residuary Instruction:* On February 1, 1994, I entered into a prenuptial agreement with SUSAN L. GEHN, who is now my wife, SUSAN L. KENDALL. If at my death she survives me, and we have not separated, then I authorize my executors to carry out the provisions of such prenuptial agreement to the extent I have not otherwise done so.

III. *Residuary Estate:* I give the residue of my estate, real and personal: A. In equal share to such of my children as survive me....

Terry's Will, 2/23/05. The will also provided for the appointment of PNC as the executor.

¶ 4 As to the present litigation, the orphans' court set forth the following as an introductory explanation regarding the parties' positions on the issues presented to it:

This matter is now before us pursuant to competing motions for summary judgment—one by the Executor and one by decedent's surviving spouse, Susan L. Kendall.... On January 22, 2008, PNC Bank, N.A., the Executor of the Estate of Terry L. Kendall, ... filed a Motion for Summary Judgment seeking a determination as to whether Mrs. Kendall is a creditor or beneficiary of the Estate and a ruling upon its underlying Declaratory Judgment Petition filed on March 8, 2007. In the Declaratory Judgment Petition, PNC proposes that decedent's Will and the Prenuptial Agreement that he entered into with Mrs. Kendall provide a formula for determining the specific amount of property to be given to Mrs. Kendall rather than giving her an interest in any specific Estate property. PNC maintains that these issues are questions of law and no material facts are involved or disputed. Decedent's children, Jennifer Kendall and Bryan Kendall, residuary beneficiaries under decedent's Will ... have filed a reply to the underlying Petition for Declaratory Judgment and a memorandum in support of PNC's Motion for Summary Judgment.

Mrs. Kendall filed an Answer and New Matter to PNC's Declaratory Judgment Petition. On March 24, 2008, Mrs. Kendall filed a response in opposition to PNC's Motion for Summary Judgment and cross-moved for summary judgment in her favor based upon two alternate theories. First, Mrs. Kendall argues that this [c]ourt has already ruled adversely to PNC in its Opinion, Decree and Order of December 22, 2006 awarding certain property to her in kind. In the alternative, Mrs. Kendall contends that decedent's Will and Prenuptial Agreement should be interpreted as giving her the specific property in kind.

. . . .

Other than a minor checking account, decedent's Estate consists solely of CIGNA stock, CIGNA stock options, and cash representing unpaid vacation time and monetary bonus awards under CIGNA's strategic performance plan (here-

inafter collectively referred to as the "CIGNA benefits"). Per our Opinion, Decree and Order of December 22, 2006, we determined that all CIGNA benefits received by decedent's Estate accrued during his marriage to Mrs. Kendall, and therefore were Marital Property.

The issue now being raised by PNC's Declaratory Judgment Petition and the two competing motions for summary judgment is whether Mrs. Kendall is entitled to these CIGNA benefits in kind or whether she is entitled [to] receive property equal in value to a specific amount calculated through a formula that would include the date of death value of these CIGNA benefits. Subparagraph G(1) of the Prenuptial Agreement is the operative paragraph. That provision gives certain rights to Mrs. Kendall in lieu of her spousal right to claim an elective share in decedent's estate.

Orphans' Court Opinion, 11/14/08, at 1–2 (citations to the record omitted).

¶ 5 The orphans' court recognized that Susan's interest in the Estate was determined by subparagraph G.(1) of the prenuptial agreement and indicated that PNC's interpretation of G.(1) centered on a formula, which would result in a specific amount and could be zero. PNC's formula provides:

(1) First, all property owned by Terry L. Kendall at the time of his death, whether subject to probate or not, must be identified;

(2) Second, the character of such property as Marital Property or Separate Property under the Prenuptial Agreement must be determined;

(3) Third, the date of death value of all property characterized as Marital

Property on the date of Terry L. Kendall's death must be calculated.

(4) Fourth, the amount of all Marital Debt must be determined and subtracted from the sum value of all Marital Property.

(5) Fifth, the sum of the date of death values of all Marital Property that Terry L. Kendall provided for Mrs. Kendall to receive through Paragraph I of the Will, joint ownership of property, beneficiary designations, or otherwise must be determined.

(6) Sixth, the sum determined in Subparagraph (5) above must be subtracted from the sum determined in Subparagraph (4) above.

(7) If the result of Subparagraph (6) above is zero or a negative amount, then Mr. Kendall has fulfilled his obligations to Mrs. Kendall under Paragraph G of the Prenuptial Agreement and she has no claim as creditor against any Estate assets. If the sum is a positive amount, Mrs. Kendall has a claim against the Estate in that amount.

PNC's Petition for Declaratory Judgment, ¶ 16.

¶ 6 The orphans' court opinion dated November 14, 2008, references an earlier opinion and order it issued on December 22, 2006, that determined the status of the CIGNA benefits that were paid into the Estate.[3] Due to the issues raised in this appeal and the orphans' court's revision of the 2006 opinion and order in its 2008 decision, we must also examine that prior decision.

¶ 7 On December 22, 2005, Susan filed a petition for declaratory judgment request-

---

**3.** The parties appear to agree that according to CIGNA's incentive plan Terry was not able to designate a beneficiary of these assets; rather, the terms of the plan required the benefits to be paid to a deceased participant's estate.

ing the court to direct that the CIGNA benefits held by the Estate were marital property as defined by the prenuptial agreement and that she was entitled to those benefits in accordance with ITEM II of Terry's will. The Children likewise filed a petition for declaratory judgment seeking an interpretation of the prenuptial agreement to determine whether some of the CIGNA benefits were Terry's separate property and should pass to them under ITEM III of Terry's will. PNC indicated that it was a stakeholder and, consequently, did not actively participate in the litigation that resulted in the orphans' court's 2006 decision.[4]

¶ 8 After a thorough discussion centered on the language of various paragraphs of the prenuptial agreement, including the definitions of "separate property" and "marital property," but not paragraph G.(1), the orphans' court determined that:

> All of the CIGNA benefits received by decedent's Estate were obtained as a result of his employment from 1998 to 2005. Because he was married to Susan Kendall during this entire period, all CIGNA benefits received by the Estate are Marital Property and should be distributed to Susan Kendall pursuant to ITEM III[sic] of decedent's Will in accordance with the Prenuptial Agreement.

Orphans' Court Opinion, 12/22/06, at 10.[5] Accordingly, the court granted Susan's petition for declaratory judgment and denied the Children's petition. No appeal was taken from this determination, although the court declared its order to be a final order for purposes of Pa.R.A.P. 342.

¶ 9 As noted previously, in response to PNC's and Susan's respective motions for summary judgment and PNC's underlying declaratory judgment action, the orphans' court's 2008 decision now on appeal, held that the formula suggested by PNC properly interpreted subparagraph G.(1) of the prenuptial agreement and defined Susan's interest in the Estate, thus, placing her in the position of a creditor of the Estate and not a beneficiary.[6] This decision essentially nullified that portion of the court's prior 2006 order that provided for the distribution of the CIGNA benefits to Susan.

¶ 10 Susan filed the instant appeal, raising the following three issues for our review:

1. Did the Trial Judge err by substantively amending a final order entered in a declaratory judgment proceeding nearly two years after its entry?

2. Did the Trial Court err in denying discovery and granting summary judgment when affirmative defenses

---

4. In addition to the litigation concerning Susan's and the Children's declaratory judgment actions, Susan also filed an "Emergency Motion to Compel Exercise and Liquidation [sic] of Stock Options" requesting the court to direct PNC to exercise the options with regard to the CIGNA stock. Susan alleged that PNC's inaction caused a loss to the Estate. Although the Emergency Motion was deemed moot after PNC exercised the options, Susan subsequently filed a surcharge claim against PNC in the amount of $1.2 million dollars.

5. The parties point out and it is evident that the orphans' court erroneously cited ITEM III

rather than ITEM II of Terry's will as the item designating Susan's entitlement to property under the will.

6. *See In re Estate of Blumenthal,* 812 A.2d 1279, 1290 (Pa.Super.2002) (stating that "when a testator in his will gives specified property or a share of his estate in exact or substantial compliance with the terms of his obligations under an inter vivos property settlement [or antenuptial agreement] made with his wife, that wife is a creditor of his estate and not a legatee under his will").

properly raised factual issues requiring an evidentiary hearing?

3. Did the Trial Court err in interpreting the Prenuptial Agreement and Will?

Susan's brief at 4.

¶ 11 The thrust of Susan's first issue rests on her contention that the orphans' court lacked jurisdiction to modify its December 22, 2006 order after thirty days. Specifically, she asserts that the 2006 order declared that she was entitled to receive nearly $4.3 million of the CIGNA assets from the Estate in-kind pursuant to paragraph G.(1) of the prenuptial agreement and ITEM II of Terry's will and that the court improperly determined that it had the power to correct what it deemed to be a mistake made in its 2006 decision.

¶ 12 In the 2008 decision, the orphans' court first determined that PNC's formula gives effect to all the words contained in subparagraph G.(1) of the prenuptial agreement, while Susan's interpretation requiring in-kind distribution does not. Particularly, the court noted that Susan's "proposed interpretation of subparagraph G.(1) nullifies Item II of decedent's Will inasmuch as she is demanding from PNC all the Estate's assets even though decedent already may have fulfilled his prenuptial obligation to her though [sic] pre-death arrangements." Orphans' Court Opinion, 11/14/2008, at 8. Having thus concluded that PNC's formula properly interprets subparagraph G.(1), the court realized that its "determination that the CIGNA benefits are Marital Property under the Prenuptial Agreement does not determine distribution under decedent's Will." *Id.* This conclusion is exactly what Susan argues against. She indicates that she was al-

ready awarded the CIGNA benefits in-kind by the December 22, 2006 order, an order that she contends the court cannot amend two years after the fact with reliance on 42 Pa.C.S. § 5505.[7]

¶ 13 The court recognized that in its 2006 order it did in fact direct that Susan "is entitled ... to receive all stock and payments that have been or will be transferred to the Estate pursuant to the CIGNA Long–Term Incentive Plan and/or directly from CIGNA." Orphans' Court Opinion, 11/14/08, at 9. However, it concluded that "distribution was not the issue that was being addressed in our Opinion, Decree and Order of December 22, 2006, and that the December 22, 2006 Order, to the extent that it awarded the CIGNA benefits to Mrs. Kendall in[-] kind, was a mistake and is clearly wrong." *Id.* at 10. The court further explained that even if distribution of the CIGNA benefits to Susan was before it in 2006, without information as to the value of non-probate property already received by Susan that satisfied Terry's obligations or the amount of marital debt, it was not in a position to decide the distribution issue at that time. Accordingly, with reliance on case law from the early nineteen hundreds and the Supreme Court's decision in *In re Estate of Bell,* 463 Pa. 109, 343 A.2d 679 (1975), the orphans' court held that it had inherent equitable powers to review and correct its own mistakes, *i.e.,* those made in the 2006 opinion and order.

¶ 14 In particular, the court explained that despite the 1968 Constitutional Amendment that abolished the orphans' court as a separate court, it found no authority supporting the proposition that

7. Section 5505 of the Judicial Code provides: Except as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding prior termination of any term of court, if no appeal from such order has been taken or allowed.

the orphans' court as a division of the court of common pleas had lost its inherent equitable powers. Orphans' Court Opinion, 11/14/08, at 12. Specifically, the court quoted the *Bell* decision that references 20 Pa.C.S. § 3521.[8] The *Bell* court stated:

A long line of Pennsylvania cases has interpreted this statute and its predecessors as a legislative extension of the Orphans' Court's inherent discretionary power to review and correct its own decrees. "The object of [the Act of 1840, October 13, P.L. 1841, 1, § 1] seems to have been to make a bill of review in the Orphans' Court a matter of right, and at the same time prescribe a limitation of time to the exercise of the power." *Kinter's Appeal*, 62 Pa. 318, 320 (1869). *Accord, Stetson's Estate*, 305 Pa. 62, 155 A. 856 (1931); *Meckel's Appeal*, 112 Pa. 554, 4 A. 447 (1886). Irrespective of the statute, the Orphans' Court possesses an inherent discretionary right, recognized at common law, to correct its own records and decrees in the interest of justice. *Huff's Estate*, 300 Pa. 64, 150 A. 98 (1930); *Willing's Estate*, 288 Pa. 337, 135 A. 751 (1927); *Troutman's Estate*, 270 Pa. 310, 113 A. 405 (1921); *Sloan's Estate*, 254 Pa. 346, 98 A. 966 (1916). Therefore, the discretionary power in the Orphans' Court to review its own decrees was never changed by the line of statutes which culminated in Section 3521. The Orphans' Court may still, in accordance with the long-established practice, entertain a petition for review notwithstanding a decree of confirmation by this Court, but only where the questions were not raised or passed upon appeal.

This would naturally include cases of after-discovered evidence or fraud. But where issues have been decided by the lower court and affirmed on appeal, the Orphans' Court is powerless, under common law or statute, to entertain these issues again by bill of review. *Lawler v. Commonwealth*, 347 Pa. 568, 33 A.2d 432 (1943); *Graham's Estate*, 302 Pa. 208, 153 A. 136 (1931); *Bailey's Estate*, 291 Pa. 421, 140 A. 145 (1927); *Lockhart's Estate*, 111 Pa.Super. 15, 169 A. 475 (1933). The statutes which have provided for peremptory review by the Orphans' Court merely demanded that the Orphans' Court entertain a review if the bill was presented within five years. The Orphans' Court's power of review has always been limited to its own decrees and to those portions of its decrees which were not dealt with on appeal. There is nothing in Section 3521 which defeats the judicial doctrine of *res judicata* as to holdings of this Court.

*Bell*, 343 A.2d at 681.

¶ 15 Although the orphans' court acknowledged that its determination in 2006 was not in the context of a confirmation of an account, it recognized that without a correction to the 2006 order, any adjudication of the final account will require distribution in accordance with the 2006 order, which will result in a distribution "at odds with decedent's Will and Prenuptial Agreement." Orphans' Court Opinion, 11/14/08, at 14. Thus, the court concluded "that a correction of the December 22, 2006 Order eliminating the direction that the CIGNA benefits are distributable to Mrs. Kendall

---

8. Section 3521 of the Probate, Estates and Fiduciaries Code provides in pertinent part:
If any party in interest shall, within five years after the final confirmation of any account of a personal representative, file a petition to review any part of the account or of an auditor's report, or of the adjudication, or of any decree of distribution, setting forth specifically alleged errors therein, the court shall give such relief as equity and justice shall require....

is the appropriate relief 'as equity and justice shall require.' " *Id.*

¶ 16 Even though Susan contends that distribution of the CIGNA assets was at issue before the court in 2006, she also acknowledges that the "*disputed* issues requiring legal analysis" before the court in 2006 were a determination as to "what was Separate Property and what was Marital Property." Susan's brief at 30 (emphasis in original).[9] This recognition on her part provides support for the orphans' court's corrective measures. It appears evident that although the distribution language was used by the parties and the court, the court was not in a position to distribute the Estate assets without considering subparagraph G.(1) of the prenuptial agreement, which it did not do in the 2006 decision.

■ ¶ 17 Accordingly, we rely on the *Bell* decision, the introductory language in 42 Pa.C.S. § 5505 ("[e]xcept as otherwise provided or prescribed by law"), and the legislature's purpose in enacting 20 Pa.C.S. § 3521 (allowing for review of an account within a five year period to "give such relief as equity and justice shall require"), to arrive at our conclusion that the orphans' court properly rectified the error it

made in its 2006 decision. Moreover, recognizing that no appeal was taken from the 2006 order, *see Bell, supra,* and that the court did not discuss the operative subparagraph G.(1) in its 2006 decision, we conclude that under the facts and procedural posture of this case, the orphans' court properly found that it had mistakenly stated that the CIGNA assets were to be distributed to Susan and corrected its error, which now allowed for it to determine the distribution of the assets of Terry's Estate as he directed in his will in combination with the prenuptial agreement. Accordingly, we must conclude that Susan's first issue is without merit.[10]

¶ 18 Susan's second issue relates to the petition for discovery that she filed subsequent to PNC's filing of its declaratory judgment action in March of 2007. In her petition, Susan requested discovery in four distinct areas: (1) discovery related to "mistake," (2) discovery related to affirmative defenses, (3) discovery related to CIGNA benefits, and (4) discovery related to count II of her petition for declaratory judgment. The orphans' court by order dated December 13, 2007, denied her requests for discovery in areas (1), (2) and

---

9. An order issued on April 26, 2006, recognized that the parties agreed "that a purely legal question is involved in interpreting the Prenuptial Agreement and its effect on interspousal transfers of 'separate property' from decedent to [Susan] or from decedent to the joint names of decedent and [Susan]." Order, 4/26/06. Thus, the order directed Susan and the Children to submit "brief memoranda on the legal interpretation of 'separate property' as used in Paragraph A(3) of the Prenuptial Agreement and the effect of interspousal transfers of 'separate property' during the marriage of the descendent and [Susan]." *Id.* The interpretation of subparagraph G.(1) was not a part of the issue before the court at that time.

10. With regard to Susan's assertion that *res judicata* applies, we conclude that it does not

because the ultimate issue was not before the court in 2006 and was not decided. *See Hopewell Estates, Inc. v. Kent,* 435 Pa.Super. 471, 646 A.2d 1192, 1195 (1994) (when applying *res judicata,* what "the court [should] consider is whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties actually had an opportunity to appear and assert their rights."). Specifically, Susan asserts that *res judicata* bars the relitigation of the interpretation of subparagraph G.(1), obviously claiming that subparagraph G.(1) was interpreted by the court in the 2006 opinion. Susan misreads the 2006 decision. No interpretation of that subparagraph was included in the 2006 decision; rather the interpretation at issue was the definition of marital and separate property.

(3), but deferred discovery on area (4) until after it rendered a decision on PNC's declaratory judgment petition.

¶ 19 With regard to area (1) discovery related to mistake, Susan sought discovery to ascertain what PNC, the Children, their respective counsel, both present and former, and the court thought was at issue in the 2005–06 litigation and what was discussed at conferences relative to the "issue of the Marital Property being distributed to Mrs. Kendall, and what issues were in dispute and would be presented to the Court for adjudication." Susan's Petition for Discovery, 11/15/07, at 2. Likewise, area (2) again sought discovery from PNC, the Children, present and former counsel, and the court relative to Susan's affirmative defenses raised in new matter to PNC's declaratory judgment action. Area (3) dealt with discovery from CIGNA about its plan and Terry's inability to designate a beneficiary, and area (4) concerned Count II of Susan's declaratory judgment action involving the proceeds from the sale of 5000 shares of CIGNA by PNC. *Id.*

¶ 20 In her brief, Susan appears to seek the discovery due to what she terms PNC's lack of impartiality and its "improper self-dealing and unclean hands." Susan's brief at 45. She contends that discovery was pertinent to "her affirmative defense of judicial and equitable estoppel" and that "PNC should have been estopped from seeking an interpretation of the Prenuptial Agreement that was inconsistent with its words and conduct during the earlier proceedings." *Id.* at 46. Essentially, Susan asserts that the court "compounded its error when it granted summary judgment to PNC in spite of these affirmative defenses, which presented material disputes of fact." *Id.* at 47.

¶ 21 In response to this argument, PNC and the Children contend that the issue before the orphans' court in the 2008 litigation was centered on the interpretation of the prenuptial agreement, namely, subparagraph G.(1). Citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 436 (2004), they claim that because subparagraph G.(1) was clear and unambiguous, the court was to examine the language itself and that parol evidence was not permitted. Simply stated, they contend that Susan's discovery motion would only produce inadmissible parol evidence that would not be material to the interpretation of the prenuptial agreement.

¶ 22 Additionally, PNC and the Children argue that Susan's discovery petition "inappropriately sought the mental impressions and opinions of the [c]ourt, counsel, former counsel, and parties." PNC's brief at 39 (quoting *Leber v. Stretton*, 928 A.2d 262, 268 (Pa.Super.2007) ("It has long been recognized that attempts to probe the thought and decision making processes of judges and administrators are generally improper.")). *See also* Pa.R.C.P. 4003.3 ("The discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories.").

¶ 23 We agree with the position taken by PNC and the Children, noting that "[a]s to interpretation, enforcement, and remedies, in Pennsylvania, antenuptial agreements are interpreted in accordance with traditional principles of contract law." *Sabad v. Fessenden*, 825 A.2d 682, 688 (Pa.Super.2003). Moreover, "[t]he law of contracts requires contractual terms that are clear and unambiguous to be given effect without reference to matters outside the contract." *Purdy v. Purdy*, 715 A.2d 473, 475 (Pa.Super.1998). Susan does not claim that the agreement is ambiguous, but still contends that her discovery requests, which she believes raise factual

issues, should have been granted. However, even if the thoughts and understanding of the court, the parties, or their attorneys were discoverable, that information was not admissible as parol evidence without a determination of ambiguity. Accordingly, we conclude that the court's dismissal of Susan's discovery petition, with the exception of area (4), was not an abuse of discretion. Susan's second issue is, therefore, deemed to be without merit.

■ ¶ 24 The third issue Susan raises concerns the interpretation of subparagraph G.(1) of the prenuptial agreement, an issue Susan contends was previously decided in the prior determination. However, since we have determined that the interpretation of G.(1) was not before the court in 2006, that interpretation is properly before the court at this time.

"The determination of marital property rights through prenuptial, post-nuptial and settlement agreements has long been permitted, and even encouraged." *Laudig v. Laudig*, 425 Pa.Super. 228, 624 A.2d 651, 653 (1993). Where a prenuptial agreement between the parties purports to settle, fully discharge, and satisfy any and all interests, rights, or claims each party might have to the property or estate of the other, a court's order upholding the agreement ... is subject to an abuse of discretion or error of law standard of review. *See Busch v. Busch*, 732 A.2d 1274, 1276 (Pa.Super.1999), *appeal denied*, 563 Pa. 681, 760 A.2d 850 (2000) (citing *Laudig, supra*). An abuse of discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures. *Paulone v. Paulone*, 437 Pa.Super. 130, 649 A.2d 691 (1994). We will not usurp the trial

court's fact-finding function. *Laudig, supra.*

*Sabad*, 825 A.2d at 686.

■ ¶ 25 Specifically, Susan's argument centers on the phrase "with a value at the time of Terry's death" disagreeing with the orphans' court's determination that this phrase mandates that Susan is entitled to an amount that is calculated rather than her receiving the property in-kind. Susan's brief at 50. As noted previously, the orphans' court held that the formula suggested by PNC properly interpreted subparagraph G.(1) of the prenuptial agreement, and that Terry's will did not give all marital property in the probate estate to Susan, basing its decision in part upon the following quoted portion of the G.(1) provision:

... by Will, Codicil, joint ownership of property or otherwise for Susan to receive *Property with a value at the time of Terry's death equal to at least* One Hundred Percent(100%) *of the value of all Marital Property* reduced by the amount of Marital Debt. Prenuptial Agreement, ¶ G(1)(emphasis added).

Orphans' Court Opinion, 11/14/08, at 6. The court then explained that the formula determined a *value of the property* and the *value of all marital property* pinpointed in time (at the time of Terry's death), and concluded that it results in an amount that is equal to at least 100% "of that to which Susan is entitled." *Id.* at 6–7. The court also noted that Susan's interpretation of an in-kind distribution does not give effect to the italicized words and also ignores an offset for marital debt.

¶ 26 The court further explained:

Subparagraph G(1) requires decedent to make certain provisions for the benefit of Mrs. Kendall "by Will, Codicil, joint ownership of property or otherwise." PNC's interpretation recognizes that decedent's obligations under the

Prenuptial Agreement may be satisfied with non-probate assets. Decedent's obligations could be wholly satisfied by beneficiary designations, tenancy by the entireties ownership, and/or joint ownership of property with rights of survivorship. Mrs. Kendall's interpretation ignores that decedent can fulfill his obligations by "joint ownership of property or otherwise" that would pass assets to Mrs. Kendall outside of his Will.

If decedent failed to provide for Mrs. Kendall as he was required to do under the Prenuptial Agreement, only then, pursuant to the third sentence of subparagraph G(1), was Mrs. Kendall entitled to receive any property from decedent's Estate: "If Terry shall fail to make the provision contained in the Subparagraph, Susan shall be entitled to receive the Property described in this Subparagraph *from Terry's estate.*" (Emphasis added). Mrs. Kendall fails to mention this sentence or reconcile it with her interpretation of subparagraph G(1). This sentence becomes surplusage under Mrs. Kendall's interpretation.

Mr. Kendall, in Item II of his Will, did provide for Mrs. Kendall as he was required to do under the Prenuptial Agreement. He authorizes his executor "to carry out the provisions of such prenuptial agreement *to the extent that I have not otherwise done so.*" ( [E]mphasis added). Although this Court does not know the amount of non-probate property that Mrs. Kendall has received because of decedent's death, the clause in Item II of decedent's Will, italicized above, indicates that decedent, during his lifetime, may already have been transferring property to Mrs. Kendall to satisfy his obligations to her under the Prenuptial Agreement. Decedent's executor is to give Mrs. Kendall probate property only to the extent that decedent's pre-death arrangements

do not entirely fulfill his obligations under the Prenuptial Agreement. Mrs. Kendall's proposed interpretation of subparagraph G(1) nullifies Item II of decedent's Will inasmuch as she is demanding from PNC all the Estate's assets even though decedent already may have fulfilled his prenuptial obligations to her through pre-death arrangements.

Mrs. Kendall's counsel contends that there are only two kinds of Property— Marital Property and Separate Property. First, this contention is not accurate. The Prenuptial Agreement expressly defines "Property" as "real and personal property, of every kind, tangible and intangible, wherever situated." Prenuptial Agreement, ¶ A(2). "Separate Property" is then defined in subparagraph A(3), and "Marital Property" is defined in subparagraph A(4). As a result, when the Prenuptial Agreement in subparagraph G(1) gives Mrs. Kendall a right "to receive Property with a [specified] value at the time of Terry's death," this right is not limited to Marital Property. Instead, Mrs. Kendall has a right to receive "Property," which is any "real and personal property, of every kind, tangible and intangible," irrespective of whether this property was Marital Property or Separate Property during decedent's lifetime.

Orphans' Court Opinion, 11/14/08, at 7–8.

¶ 27 Having reviewed the pertinent documents, the parties' arguments and the court's reasoning, we agree that the court properly interpreted the language of the prenuptial agreement as it exists in conjunction with Terry's will. The court did not abuse its discretion as it applied contract law; it considered the documents as a whole and gave effect to all the provisions. *See Gaffer Ins. Co. v. Discover Reinsurance Co.,* 936 A.2d 1109, 1115 (Pa.Super.2007) (considering the contract

as a whole and giving effect to every provision if possible is a basic principle of contract interpretation). Therefore, we must conclude that Susan's final issue is without merit.

¶ 28 Order affirmed.