J-A18041-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| W.S. AND E.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| M.S. AND J.S. | : | |
| _____ | : | |
| M.S. | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| J.S. | : | |
| | : | |
| | : | |
| APPEAL OF: J.S. | : | No. 245 WDA 2019 |

Appeal from the Order Entered January 11, 2019
in the Court of Common Pleas of Allegheny County
Family Court at No(s): FD-17-009101

BEFORE: BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED SEPTEMBER 30, 2019**

J.S. appeals from the Order denying her Motion for Recusal in the underlying custody action. We dismiss the appeal.

The trial court thoroughly set forth the relevant factual and procedural history underlying this appeal in its Opinion, which we incorporate as though fully set forth herein. *See* Trial Court Opinion, 4/2/19, at 1-11.

On appeal, J.S. raises the following issues for our review:

I. Did the trial court abuse its discretion when it failed to recuse itself where substantial doubt exists as to [the trial judge's] ability to preside fairly and impartially?

II. Did the trial court err and abuse its discretion when it denied [J.S.'s] Motion for Recusal without a hearing?

Brief for Appellant at 5.

Before we may entertain the merits of J.S.'s underlying claims, we must first determine whether this Court has jurisdiction to consider the appeal. *See Murphy v. Int'l Druidic Soc'y*, 152 A.3d 286, 289 (Pa. Super. 2016) (stating that "the appealability of an order goes directly to the jurisdiction of the Court asked to review the order." (internal citation and quotation marks omitted)); *see also Commonwealth v. Davis*, 176 A.3d 869, 873 (Pa. Super. 2017) (recognizing that this Court may raise the issue of jurisdiction *sua sponte*).

"As a general rule, only final orders are appealable, and final orders are defined as orders disposing of all claims and all parties." *Haviland v. Kline & Specter, P.C.*, 182 A.3d 488, 492 (Pa. Super. 2018) (internal citations and quotation marks omitted). However, an appeal may also be taken from an interlocutory order as of right, an interlocutory order by permission, or a collateral order. *See Kensey v. Kensey*, 877 A.2d 1284, 1287 (Pa. Super. 2005).

In its Opinion, the trial court addressed whether the Order from which J.S. seeks to appeal falls within any of the above-mentioned categories of orders over which this Court has jurisdiction. *See* Trial Court Opinion, 4/2/19, at 11-17. We incorporate the trial court's cogent analysis as though fully set forth herein. *See id.* The trial court emphasized the following:

- [T]he [r]ecusal Order has not been labeled or deemed to be final or requiring an immediate appeal. Nor does it dispose of all claims and parties. … [N]one of the [c]ourt's [O]rders have been intended to constitute a complete resolution of the custody claims pending between the parties;

- The [r]ecusal Order does not fall within the scope of [interlocutory orders appealable as of right] … under [Pa.R.A.P.] 311…;

- The [r]ecusal Order does not contain the requisite language … necessary for the Superior Court to invoke jurisdiction [for an interlocutory appeal by permission] pursuant to 42 Pa.C.S.[A.] § 702(b);

- The Superior Court has held that the denial of a pre-trial motion to recuse does not fit into … [Pa.R.A.P.] 313 [(governing appealable collateral orders)].

*Id.* at 11-12, 16, 17 (internal citations and quotation marks omitted).

Because this Court does not have jurisdiction to entertain an appeal from the trial court's Order, we must dismiss the appeal.

Appeal dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/2019

- 3 -

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

W/ ~ S      and E.                    No: FD 17-009101-002
SI

                                      Superior Court #245 WDA 2019

            Plaintiffs,

        v.                            **OPINION**

M       S      and                    BY:
J(      S                             Honorable Susan Evashavik DiLucente
                                      704 City County Building
            Defendants.               414 Grant Street
                                      Pittsburgh, PA 15219

M       S.

            Plaintiff,                COPIES TO:

        v.                            Counsel for W,      & E    , S
                                      C. Kurt Mulzet, Esquire
J       S!                            411 7th Avenue, Suite 1200
                                      Pittsburgh, PA 15219

            Defendant.
                                      Counsel for M        · S
                                      Jennifer M. McEnroe, Esquire
                                      630 Oliver Building
                                      535 Smithfield Street
                                      Pittsburgh, PA 15222

                                      Counsel for J        .) S·
                                      Richard Ducote, Esquire
                                      4800 Liberty Avenue, Floor 2
                                      Pittsburgh, PA 15224

                                      Guardian Ad Litem:
                                      Lea E. Anderson, Esquire
                                      437 Grant Street
                                      1400 Fick Building
                                      Pittsburgh, PA 15219

FILED
19 APR -2 PH 2: 44
DEPT. OF ... RECORDS
CIVIL ... BRANCH
ALLEGHENY ... TY PA

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

FAMILY DIVISION

W.     S            and
EI   S

Plaintiffs,

v.

M        S            and
J        S

Defendants.

N        S

Plaintiff,

v.

J        S

Defendant.

No: FD 17-009101-002

Superior Court #245 WDA 2019

## OPINION

Evashavik DiLucente, J.                                          April 2, 2019

### I.     Background

The parties to this action, Defendant J        S            ("Mother") and Plaintiff M

S          ("Father"), married in April 2003. The marriage produced two children, A.S. (DOB:

8/6/04) and T.S. (DOB:1/27/06) (collectively, the "Children").

On October 12, 2017, Father initiated the instant proceedings by filing a complaint for

shared legal and primary custody of the Children. Mother filed a counter-complaint seeking the

same relief, and Father subsequently filed for divorce. Shortly thereafter, the parties filed cross-

petitions for protection from abuse, which ultimately resulted in the entry of a mutual no-contact

order, with a provision for Father and Children to commence reunification counseling.

1

The parties proceeded through Generations and participated in a hearing to establish an interim physical custody schedule, wherein Father was granted supervised visitation. In addition and among other things, the Children's paternal grandparents ("Paternal Grandparents") filed a complaint for partial custody and received limited visitation, a guardian *ad litem* was appointed for the Children, and psychological evaluations were ordered.

Numerous motions were presented and this Court conducted several conciliations regarding the status of the reunification counseling and Father's visitation, as the Children effectively refused to participate in both. Between the October 2017 initiation of this custody action and the entry of the October 26, 2018 Consent Order, which was the subject of Mother's companion appeal, Father and the Children's relationship had actually deteriorated. Issues were raised regarding the Children's emotional and mental health. Concerns arose over allegations that the Children had become alienated/estranged from Father and Paternal Grandparents.

In an attempt to address the alienation/estrangement and Children's health concerns, Father presented an emergency *ex parte* petition regarding custody to this Court. Father averred that the Children's defiant behaviors were escalating, putting their safety at risk. Further, he alleged that Mother and the Children were a flight risk. In response, the Court entered an order on October 9, 2018 (though the order was inadvertently dated October 5, 2018) providing, *inter alia*, that:

- Father received sole legal custody of the Children, see Interim Order of Court Regarding Custody Dated 10/5/2018 (the "October 9 Order") at ¶ 1;

- Father received sole physical custody of the Children, though they were required on an interim basis to reside with their paternal aunt and uncle in Texas pending further order of court, id. at ¶ 2;

- the Children would have no contact with Mother pending further order of court, id. at ¶ 7; and

2

- a hearing would occur on October 25, 2018, to review the interim order itself and to address Mother's no-contact order and any therapeutic interventions that might be needed for the Children, id. at ¶¶ 9-10 & 20.

The Children were subsequently transported to Texas where they began living with their paternal aunt and uncle and receiving therapeutic treatment..

Mother sought relief related to the October 9 Order in the Superior Court, which docketed that proceeding at 96 WDM 2018. By order entered on October 17, 2018, the Superior Court, among other things, stayed the October 9 Order, mandated that the Children be returned from Texas, required that the parties and this Court reestablish "the *status quo*" that existed prior to entry of the October 9 Order, and stated that this Court must hold a hearing within ten (10) days of October 16, 2018, with notice to all parties.

The Children returned from Texas and to Mother.

After receiving the Superior Court's order in 96 WDM 2018, this Court entered an order on October 18, 2018, expanding by one day the previously scheduled hearing related to the October 9 Order. Accordingly, the hearing originally set for October 25, 2018, was rescheduled for October 25 and 26, 2018.

The parties – i.e., Mother, Father, and Paternal Grandparents – and their counsel appeared before this Court on October 25, 2018, for the hearing. Mother's counsel then made an oral motion for recusal (the "October Recusal Motion") based upon the October 9 Order, which the Superior Court addressed in 96 WDM 2018, and the proceedings leading to its entry. See October 25-26, 2018 Hearing Transcript ("HT") at 13-20. The Court denied the October Recusal Motion. Id. at 20.

The hearing subsequently began. Among other individuals, the court-appointed expert in custody evaluation Dr. Neil D. Rosenblum ("Dr. Rosenblum") testified. He explained that he

3

performed a psychological evaluation for the Children's custody, and Dr. Rosenblum noted that in doing so:

> [t]he parties, the [M]other and the [F]ather, were initially interviewed by [Dr. Rosenblum's] associate . . . on 6/25/18 and 6/29/18. [He then] did [his own] individual interviews with each parent. Father first, on 7/23/18 and 8/9/18. [Dr. Rosenblum] met with Mother and the [Children] . . . on 8/21/18 and also interviewed each boy individually on that date. On 9/6/18, [he] did a follow-up interview with the [F]ather. On 9/10/18, [Dr. Rosenblum] met with the [P]aternal [G]randparents . . . . On 9/24/18, [he] did a follow-up interview with Mother . . . . On 10/1/18, [he] did a joint interview with Mother and Father. And lastly, on 10/4/18, [Dr. Rosenblum] met with the [Children] and Mother for a follow-up family interview, and then did a family interview with the [Children] Mother, and paternal grandmother . . . .

HT at 25-26. Dr. Rosenblum also prepared a thirty-four (34) page, single-spaced Psychological Evaluation For Custody report (the "Expert Report"), which was admitted into evidence. See HT at 88.

Dr. Rosenblum then testified to his findings. He explained that in his "35 years of doing these evaluations[,]" he had never seen a worse case of alienation from a parent, here Father. See id. at 138 & 139 ("This is the most severe pattern of alienation of any case that I've worked. That is correct. And that will be 35 years of doing these evaluations."). He stressed that "[w]e saw such an escalation of symptomatology and suicidal ideation that we were reaching a crisis point, which has already been mentioned. And that's why something more drastic, in my clinical opinion, needed to be attempted. I would support [their return to Texas]." Id. at 142.

Dr. Rosenblum faulted both Mother and Father for the alienation and stated the following with respect to the danger facing the Children if the Court did not intervene:

> That, as I was saying earlier, is sometimes the unfortunate outcome that sometimes a court is faced with. But one, there's a distortion of a family legacy, a family history, a continued belief system in

4

which my father didn't care about me, my father was abusive, my whole – my grandparents didn't care about me. That's how extreme this has gotten. Two, we have a situation where children are not in an environment where they're encouraged to think for themselves in a healthy, independent manner, where they endorse false scenarios. Three, where there's encouraged, or at least accepted disrespect for rules or authority figures, like the Court, like the sheriff. There is a lot of negative learning that comes along with this. And I think the boys would be fundamentally damaged in terms of their mental health and in terms of their ability to go out into the world.

Mother used the term several times that she wants her boys to grow up to be strong, independent individuals who can deal with life's problems. And I support her in that. I think she has the right goals. But it's not happening in the scenario in which they're being raised right now and in the family structure in which they're being raised right now. So I think the outcome would be where we have children who remain damaged, who remained fragmented, who remain frightened and fearful. And I believe – and I haven't gotten to this yet. And I believe this is something that has happened to Mother.

I believe . . . Mother has issues with past trauma in her life that have not been resolved. And I think this is contributing to the boys now developing the sense of traumatization of an abusive parent. She spoke about growing up with an abusive parent and an alcoholic, an abusive father and an alcoholic mother. So I think there is a lot of damage in terms of the children's future mental health and ability to enter into relationships where there's trust, where there's open communication.

As I said, the hallmark of alienation is a rigid belief systems where the children cannot think openly, where they cannot recognize that there's two sides to a story. They're, right now, in a very fixed, rigid belief system in a false scenario of the reality around them. So there's a lot of danger . . . I think there's a lot of danger if the Court doesn't intervene.

Id. at 146-48.

Dr. Rosenblum explained that Pennsylvania does not have a facility "that can provide [the Children] with appropriate care, based on the extreme pattern of alienation." Id. at 128.

5

When asked whether he recommended that the Children return to Texas or remain in Pennsylvania, the following exchange occurred:

A.     Well, that's complicated. If there is evidence that the boys were making progress in Texas and if there's evidence that in Texas there was the development of a system similar to what I outlined in my report, then I would say, although, I initially was somewhat skeptical about whether this could work or not in that I was not familiar with the boy's relationship with their cousins and with their aunt and uncle, there could be – there could very well be some benefits to that type of strategy. And I'll be very frank because of the extreme degree of alienation that I believe exists. We're at a point where the boys cannot even tolerate looking at their father, let alone visiting him. As I said just at the very beginning, before I started to testify so to speak, we've reached a very extreme pattern of disconnect between the boys and the paternal side of the family, we would probably have to be looking at a program that offered some degree of more forceful intervention. And I did say that in my report, that I understood why – I wasn't consulted about the Court's decision[, i.e., the October 9 Order], but I understood why there was a need to do something, given the lack of therapeutic progress and the extreme resistance the boys were showing to any type of visitation whatsoever.

* * *

So if there's evidence that the boys could establish some degree of comfort [in Texas], some degree of trust in that environment, it might be an ideal healing agent for the boys that would get them away from this entire animosity, this entire – because we probably haven't talked about it enough. In any divorce, children are sometimes thrust in the middle. And the Court, I know, is well aware of that.

In this case, the boys are living and breathing this conflict. It's impacting on them to a phenomenal degree. And everyone agrees, Mother and Father, that the one thing – and grandparents agree on, that these were great kids at one time. Well adjusted, high academic achievers. There is the disagreement as to whether they were involved in enough social activities . . . . But they were good kids. And what we have now is a system in stress and boys who are in

6

distress. And again, that's why I did support or had understanding, even though I was unaware of what intervention the Court chose [in the October 9 Order]. It was my professional opinion that some intervention needed to take place. But again, if we have the less extreme over – I'm convinced that no therapeutic intervention here in Pennsylvania alone is going to achieve enough progress...

...[B]ased on the limited information that I have about Texas, it may well be a buffer that could be the best of both worlds for the boys, achieve some therapeutic progress, take them out of the high level of conflict. And if it is a safe environment, gradually integrate the boys into their lives, gradually reintroduce Mother into their lives in a healthier way that can support the end goal of the boys having a healthy relationship with each parent.

Q.     If the boys were to return to Texas, what would your recommendation be?

A.     Well, I outlined that in, you know, the beginning, on page 32 and, largely page 33 of my [Expert R]eport. There needs to be a crisis team in place. There needs to be a consultant to the crisis team. Each boy should have their own individual therapists, and then conduct family therapy, that would involve the boys, their cousins, their aunt and uncle. Gradually, there would be recommendations for limited contact by Mother and Father in the form of, excuse me, letters, phone calls, Skype or Facetime session, things of that nature, and then actual, physical visits.

I recommend that Mother and Father each work with an individual therapist here in Pittsburgh that specializes in high-conflict custody resolution. . . . And I would recommend that those therapists be allowed to maintain contact with the therapy team in Texas and provide parents with feedback so that they can be reassured that the boys are doing well. And as I said, gradually, plan a strategy through the individual therapists of Mother and Father with the boys' therapists of piecing this together so that eventually they could return to Pennsylvania, you know, under a situation where they have a much healthier understanding and a much healthier situation for how to relate to each parent.

7

You know, one thing that I haven't stressed is that even though I do believe there has been an alienating process and that I do believe that Mother has fundamentally contributed to that, I will say that this is not easy for her either. She is stressed by the boys' reaction to this. And in some ways, I think this is an avalanche that has gotten out of control, and I don't know that even she knows – I mean, I don't believe she knows how to reign it in either. It's just gotten like a freight train that's out of control. And Mother needs a way to calm down about this and to regroup and to develop healthier – a healthier understanding of what's happened here to her boys and why this splitting of good and bad is not healthy and is not appropriate and is not in her children's best psychological interest. So that's why it's critical that each parent work with an individual therapist.

I will also say this is a process. Because it is so long in developing, it's going to take time for the healthier introduction and reality testing that the boys need to work towards, to be achieved. This is not something that happened overnight. And the therapeutic process of, essentially, almost reprogramming and helping them look at an alternative ways of viewing relationships is going to take time as well.

Id. at 80-87.

After hearing testimony from other witnesses, on October 26, 2018, the parties, who were all represented by counsel, signed and entered into a Consent Order of Court Regarding Custody (the "October 2018 Order"), which the Court also signed. Therein, the following was agreed upon and ordered:

- Father and Mother received shared legal custody of the Children, see October 2018 Order at ¶ 1;

- Dr. Rosenblum would be "involved in structuring the appropriate treatment/intervention for the Children in accordance with [pages 32 and 33 of the Expert Report, as discussed in the testimony quoted above,] with input from the Children's [paternal aunt and uncle, in Texas], id.;

- the Children would reside with their paternal aunt and uncle in Texas on an interim basis pending further order of court, id. at ¶ 2;

- Mother would fly with Children to Texas on October 31, 2018, and immediately return to Pittsburgh without them thereafter, id. at ¶ 3;

- neither Mother, nor Father, would have contact with the Children until such contact was authorized by "the Children's treating therapists[,]" id. at ¶ 6; and

- a status conference regarding the October 2018 Order would be scheduled for some time within thirty (30) days, id. at ¶ 12.

By order entered October 31, 2018, the Court scheduled the status conference referenced above for December 4, 2018.

Also on October 31, 2018, Mother failed to transport the Children to Texas, as required by the October 2018 Order. As a result, the Court – with all parties' counsel present – signed an order permitting the Allegheny County Sheriff's Department to take all steps necessary to enforce the October 2018 Order. See 10/31/2018 Order (the "October 31 Order").

The following day, Father presented an emergency petition for relief. Counsel for all parties attended the petition's presentation, and the Court found that "there [wa]s a credible risk that the [Children] . . . [were] imminently likely to be wrongfully removed from the jurisdiction of th[e] Court." See 11/1/2018 Emergency Order Of Court Regarding Custody (the "November 1 Order") at 1. The Court further found that:

> the Children . . . have been missing for at least 30 hours, that they have not been located at Mother's home, that they have not been located at their respective schools, that they have not arrived in Texas pursuant to the Order entered on October 26, 2018, that Mother and the [Children] did not board the scheduled flights with the [Children] on October 31, 2018, and that Mother has not been heard from by this Court, or her counsel, or by any counsel or party involved in this case for at least 30 hours, and . . . Mother has not responded to requests from multiple parties regarding the present whereabouts of her and [the Children].

9

Id. at 2. Among other things, the Court ordered that Mother surrender the Children "to Allegheny County Children Youth and Families, pending their transfer to" Texas to live with their paternal aunt and uncle pursuant to the October 2018 Order. Id. at ¶ 3.

The Children were ultimately located. On November 2, 2018, after a shelter hearing at which counsel for all parties participated, this Court entered an order (the "November 2 Order") directing the Allegheny County Sheriff's department to accompany the Children to the airport to ensure they boarded the flight to Texas.

The Children were thus transported to Texas, where they currently reside with their paternal aunt and uncle; Mother was criminally charged for her conduct related to the October 2018 Order.

A status conference regarding the Children's custody was held on December 4, 2018 (the "December 4 Status Conference").

In January 2019, Mother presented (i) a petition to vacate the October 2018 Order (the "Petition to Vacate") and (ii) a motion for recusal. By order dated January 11, 2019, the Court denied the Petition To Vacate and required Mother to pay Father $750.00 in counsel fees as a sanction (the "January 2019 Order"). The Court also denied Mother's motion for recusal the same day (the "Recusal Order").

Mother appealed both the January 2019 Order and the Recusal Order to the Superior Court. The Superior Court docketed the appeal related to the former at 246 WDA 2019; the appeal concerning the latter has been docketed at 245 WDA 2019.

Requests to quash Mother's appeals were filed with the Superior Court. By order filed March 29, 2019, the Superior Court quashed the appeal regarding the January 2019 Order, i.e., the appeal at 246 WDA 2019. On the same day, the Superior Court entered an order with respect

10

to Mother's appeal of the Recusal Order, stating: "The motion to quash filed at 245 WDA 2019 is hereby **DENIED without prejudice** to the moving party's right to again raise this issue, if properly preserved, in the appellate brief or, if the brief has already been filed, then in a new application that may be filed after the appeal has been assigned to the panel of this Court that will decide the merits of the appeal."

## II.     Propriety of Mother's Outstanding Appeal

Before the Court addresses the allegations of error Mother intends to raise in her pending appeal, the Court feels compelled to address the general propriety of the appeal itself. Indeed, "[t]he appealability of an order directly implicates the jurisdiction of the court asked to review the order." Estate of Considine v. Wachovia Bank, 966 A.2d 1148, 1151 (Pa. Super. Ct. 2009) (citation and quotation marks omitted). In this Commonwealth, an appeal may be taken from only four types of orders, see id., and the Recusal Order Mother seeks to appeal does not fit within any category.

*First*, a litigant may appeal a final order. G.B. v. M.M.B., 670 A.2d 714, 717 (Pa. Super. Ct. 1996); see also 42 Pa. C.S. § 5105; Pa. R.A.P. 341. A final order either "disposes of all claims and of all parties" or is so labeled by the tribunal after determining that "an immediate appeal would facilitate resolution of the entire case." Pa. R.A.P. 341(b) & (c).

Here, the Recusal Order has not been labeled or deemed by this Court to be final or requiring an immediate appeal. Nor does such order dispose of all claims and parties. Brief comment on finality and custody law as well as the procedural posture of this case is now warranted. Our appellate courts have held that in the custody context, an "order will be considered final and appealable only if it is both: 1) entered after the court has completed its

11

hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims pending between the parties." G.B., 670 A.2d at 720. Such a holding, the Superior Court has explained:

> will protect [a] child from the protraction of custody litigation through repetitive appeals while still allowing prompt and comprehensive review of custody determinations. It will support judicial economy and efficiency and uphold the integrity of the trial court's process in deciding custody matters. On the one hand, to permit piecemeal appeals subjects the child to the uncertainties of ongoing litigation. A custody proceeding, whether on the trial or the appellate level, threatens a child's stability. On the other hand, a custody decision once finally made must be subject to review. Drawing a bright line by which finality may be determined will encourage judicial economy and efficiency by making it clear both to litigants and to trial courts when the appellate process may properly be invoked. [The] holding also serves to uphold the integrity of the trial process by not interfering with the trial court's efforts to craft a final decision and by not permitting premature challenges to those efforts. In striking a balance between postponing and granting an appeal, [the courts] have attempted to serve primarily the best interests of the child.

Id. at 720-21.

In the instant proceedings, the Court has not completed a custody hearing on the merits and none of the Court's orders have been intended "to constitute a complete resolution of the custody claims pending between the parties." Id. at 720. Indeed, the October 2018 Order notes that the Children will – "[o]n an interim basis" – temporarily reside with their aunt and uncle "pending further Order of Court." See October 2018 Order at ¶ 2. Said order also clearly contemplates continued treatment and therapeutic intervention for the Children under Dr. Rosenblum's direction, which treatment/intervention is necessary before a final decision on custody can be made. See id. at ¶ 1. The October 2018 Order additionally states that "[a] Status Conference with counsel regarding the provisions of th[e] . . . Order shall be convened and scheduled by the Court no later than thirty (30) days from the date of th[e] . . . Order of Court."

12

Id. at ¶ 12. Thus, the October 2018 Order on its face requires further action with respect to custody, and all parties and counsel understood the plain fact that the Court had yet to make a final determination pursuant to 23 Pa. C.S. § 5323(a) (defining the types of custody that can be awarded).

Nothing about the January 2019 Order – which declined to vacate the October 2018 Order – alters this analysis. Said order did nothing to the custodial framework in place at the time it was entered. The interim arrangement established by the Court in late 2018 remained in place and continues to remain in place. That arrangement is temporary and remedial in nature. This Court intended, but has been unable due to the appeals Mother filed, to regularly review the therapeutic progress of the children and parties and to adjust the interim order if appropriate. Once sufficient progress had been made to return the children to Pennsylvania, and their conditions stabilized, a custody trial could and can be scheduled.

Turning to the Recusal Order, it is thus clear that the same is a pre-trial order, one made in advance of further and already contemplated custody proceedings. The Superior Court has clearly held that "a pre-trial motion seeking to recuse a judge from further proceedings is not a final order." Krieg v. Krieg, 743 A.2d 509, 511 (Pa. Super. Ct. 1999). Such is the case even in the child custody context. See generally id.

Accordingly, the Recusal Order is not a final order. This Court has not labeled it as final or determined that an immediate appeal is necessary. Moreover, neither the October 2018 Order, nor the January 2019 Order, created a permanent or even allegedly permanent custodial framework, making the Recusal Order a pre-trial order not subject to immediate review. This Court thus respectfully submits that the Superior Court cannot base jurisdiction of Mother's appeal on its review of a final order.

13

*Second*, a litigant may appeal from certain interlocutory orders as of right. See Stahl v. Redcay, 897 A.2d 478, 485 (Pa. Super. Ct. 2006). Rule 311 of the Pennsylvania Rules of Appellate Procedure sets forth the types of interlocutory orders that qualify. See also Pa. R.A.P. 311. Among other things, Rule 311 states:

> (a) **General rule.**--An appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) from:
> (1) *Affecting judgments.*--An order refusing to open, vacate, or strike off a judgment. If orders opening, vacating, or striking off a judgment are sought in the alternative, no appeal may be filed until the court has disposed of each claim for relief.
> (2) *Attachments, etc.*--An order confirming, modifying, dissolving, or refusing to confirm, modify or dissolve an attachment, custodianship, receivership, or similar matter affecting the possession or control of property, except for orders pursuant to 23 Pa.C.S. §§ 3323(f), 3505(a).
> (3) *Change of criminal venue or venire.*--An order changing venue or venire in a criminal proceeding.
> (4) *Injunctions.*--An order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction unless the order was entered:
> (i) Pursuant to 23 Pa.C.S. §§ 3323(f), 3505(a); or
> (ii) After a trial but before entry of the final order. Such order is immediately appealable, however, if the order enjoins conduct previously permitted or mandated or permits or mandates conduct not previously mandated or permitted, and is effective before entry of the final order.
> (5) *Peremptory judgment in mandamus.*--An order granting peremptory judgment in mandamus.
> (6) *New trials.*--An order in a civil action or proceeding awarding a new trial, or an order in a criminal proceeding awarding a new trial where the defendant claims that the proper disposition of the matter would be an absolute discharge or where the

14

Commonwealth claims that the trial court committed an error of law.

(7) *Partition.*--An order directing partition.

(8) *Other cases.*--An order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties.

(b) **Order sustaining venue or personal or in rem jurisdiction.**--An appeal may be taken as of right from an order in a civil action or proceeding sustaining the venue of the matter or jurisdiction over the person or over real or personal property if:

(1) the plaintiff, petitioner, or other party benefiting from the order files of record within ten days after the entry of the order an election that the order shall be deemed final; or

(2) the court states in the order that a substantial issue of venue or jurisdiction is presented.

(c) **Changes of venue, etc.**--An appeal may be taken as of right from an order in a civil action or proceeding changing venue, transferring the matter to another court of coordinate jurisdiction, or declining to proceed in the matter on the basis of *forum non conveniens* or analogous principles.

(d) **Commonwealth appeals in criminal cases.**--In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

(e) **Orders overruling preliminary objections in eminent domain cases.**--An appeal may be taken as of right from an order overruling preliminary objections to a declaration of taking and an order overruling preliminary objections to a petition for appointment of a board of viewers.

(f) **Administrative remand.**--An appeal may be taken as of right from: (1) an order of a common pleas court or government unit remanding a matter to an administrative agency or hearing officer for execution of the adjudication of the reviewing tribunal in a

15

manner that does not require the exercise of administrative discretion; or (2) an order of a common pleas court or government unit remanding a matter to an administrative agency or hearing officer that decides an issue that would ultimately evade appellate review if an immediate appeal is not allowed.

Pa. R.A.P. 311. The Recusal Order does not fall within the scope of the above. See also Krieg, 743 A.2d at 511 ("an appeal from a denial of a pre-trial motion to recuse does not fit into any of the categories listed in Rule[ ] 311 . . . "). Accordingly, this Court respectfully submits that Rule 311 does not provide the Superior Court with a basis to conclude it has jurisdiction over Mother's pending appeal.

*Third*, a litigant may appeal an interlocutory order if given permission to do so. See 42 Pa. C.S § 702(b); see also Pa. R.A.P. 312. The governing statute states:

> When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

42 Pa. C.S. § 702(b). The Recusal Order does not contain the requisite language set forth above, and for good reason: the Court does not believe the Recusal Order meets the requirements necessary for the Superior Court to invoke jurisdiction pursuant to 42 Pa. C.S. § 702(b). Notably, Mother has also not asked this Court to include the language needed to trigger 42 Pa. C.S. § 702(b). Jurisdiction based on an interlocutory order appealable by permission does not, this Court respectfully submits, exist.

16

*Finally*, a litigant may take an appeal as of right from a collateral order. See Pa. R.A.P. 313(a). "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa. R.A.P. 313(b). The Superior Court has held that the denial of a "pre-trial motion to recuse does not fit into . . . Rule[ ] . . . 313," see Krieg, 743 A.2d at 511; accordingly, the Recusal Order is not collateral or, therefore, appealable at this time.

Based on the foregoing, this Court respectfully submits that the Superior Court does not have jurisdiction over Mother's appeal of the Recusal Order. Said appeal does not involve a final order, interlocutory order appealable as of right or by permission, or collateral order. Mother's appeal should, therefore, be quashed.

## III. Mother's Allegations of Error

Should the Superior Court disagree and not quash Mother's appeal, the Recusal Order should be affirmed.

Mother raises two purported errors regarding said order. *First*, she alleges that "substantial doubt exists as to [the Court's] ability to preside fairly and impartially." Mother bases her allegation on the Court's entry and the circumstances surrounding the entry of the October 9 Order, the October 2018 Order, the October 31 Order, and the November 1 Order. In addition, Mother cites to the off-record December 4 Status Conference as well as her belief that the Court was required to be a necessary witness at a hearing on the Petition to Vacate and in Mother's criminal proceedings. Mother's position fails.

17

At the outset, and should the Superior Court deem the Recusal Order ripe for appeal, this Court notes that Mother's allegations about the Court's conduct and ability to preside fairly and impartially are belied by her own actions. Mother and her counsel – who were familiar with the appellate process and seeking relief through the same – never sought to appeal or challenge the Court's denial of the October Recusal Motion. They also never appealed or challenged the October 2018 Order prior to January 2019, the October 31 Order, the November 1 Order, or the November 2 Order. Indeed, they did not seek this Court's recusal after entry of the October 2018 Order through and including the December 4 Status Conference, despite much activity occurring in this case. Only when Mother sought to present her Petition to Vacate, did she re-allege a basis for recusal.

Our Supreme Court has stated that "the law is clear[:] [i]n this Commonwealth, a party must seek recusal of a jurist at the earliest possible moment, i.e., when the party knows of the facts that form the basis for a motion to recuse." Lomas v. Kravitz, 170 A.3d 380, 390 (Pa. 2017). "If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived." Id.

Mother's issue here is, thus, arguably waived and time-barred. As noted, she took no action with respect to the denial of the October Recusal Motion. She and/or her counsel attended and participated in the October 25 and 26, 2018 hearing, and the entry of the October 2018 Order. She did not object to or challenge this Court's impartiality during (i) the proceedings leading to the entry of the October 31 Order, the November 1 Order, and the November 2 Order or (ii) the holding of the December 4 Status Conference.

Even if not waived, the Court notes that the law "presumes judges of this Commonwealth are honorable, fair and competent, and, when confronted with a recusal demand, have the ability

18

to determine whether they can rule impartially and without prejudice." Commonwealth v. Kearney, 92 A.3d 51, 60 (Pa. Super. Ct. 2014) (quotation marks and citation omitted). Indeed:

> [a]s a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion.

Id. (citation omitted).

The Court made the calculus required by the above and determined that it could and can assess the instant case "in an impartial manner, free of personal bias or interest in the outcome." Id. In addition, the Court concluded – and still believes – that its continued involvement in the case did not and does not create "an appearance of impropriety" and would not and will not "tend to undermine public confidence in the judiciary." Id. The Court thus properly denied Mother's request for recusal.

That Mother desired to call the Court as a witness does not compel a contrary conclusion. Regarding the Court's potential testimony at a hearing on the Petition to Vacate, said hearing did not occur and for good reason: Mother premised such a petition upon a breach of contract theory, and such a theory did not justify granting her relief. Accordingly, no hearing on the Petition to Vacate was needed.

Children "cannot be made the subject of a contract with the same force and effect as if [they] were . . . mere chattel." In Com. ex. rel. Veihdeffer v. Veihdeffer, 344 A.2d 613, 614 (Pa.

19

Super. Ct. 1975). Indeed, "it is well settled that an agreement between . . . parties as to custody is not controlling" on courts, which are instead required to take into account all relevant considerations. Id. Ultimately, any agreement between the parties that is -- after all relevant considerations are reviewed -- adopted by a court into an order acts to "bind the parties and governs further court action in the same manner as any other *custody order* issued by a court." Supko v. Monoskey, 461 A.2d 253, 256 (Pa. Super. Ct. 1983) (citation omitted) (original emphasis omitted) (new emphasis added). Accordingly, a consent custody order, like the October 2018 Order which was the subject of Mother's Petition to Vacate, must be treated like any other custody order, not a contract.

Mother did not cite any case law to the contrary or that held consent custody orders constituted contracts and must be interpreted as such. See Petition To Vacate at ¶¶ 9-17; see also Sams v. Sams, 808 A.2d 206 (Pa. Super. Ct. 2002) (cited by Mother and using principles of contractual interpretation, in part, to analyze a child support agreement, not a custody order, and also noting that "[a] mother cannot, by contract, bargain away the right of her minor children to adequate support from the father, regardless of the validity of the agreement as between the parents themselves . . . [because i]n each case it is for the court to determine whether or not the terms of the agreement are reasonable, made without fraud or coercion, and have been carried out in good faith" (citation omitted)); Adams v. Adams, 848 A.2d 991 (Pa. Super. Ct. 2004) (cited by Mother and applying rules of contractual interpretation to a settlement agreement concerning marital property rights, not custody of Children); Bianchi v. Bianchi, 859 A.2d 511 (Pa. Super. Ct. 2004) (cited by Mother and discussing principles of contractual interpretation in relation to a property settlement agreement between husband and wife, not a custody order); Yates v. Yates, 936 A.2d 1191 (Pa. Super. Ct. 2007) (cited by Mother and involving a custody

20

order, but not applying principles of contractual interpretation to the same and noting, among other things, that the trial "court . . . [wa]s certainly correct in observing that where a custody agreement between the parties is incorporated into a court order that agreement becomes as binding upon the parties any other portion of the court's order"); Colonna v. Colonna, 791 A.2d 353 (Pa. Super. Ct. 2001) (cited by Mother and involving an antenuptial agreement); Kraisinger v. Kraisinger, 928 A.2d 333 (Pa. Super. Ct. 2007) (cited by Mother and pertaining to the child support portion of a marriage settlement agreement); Ferguson v. McKiernan, 940 A.2d 1236 (Pa. Super. Ct. 2007) (cited by Mother and involving agreement as to child support between mother and sperm donor).

This Court, therefore, did not hold a hearing to adjudicate Mother's Petition to Vacate. Said petition could not obtain relief through a breach of contract theory. No hearing would have changed that result. Accordingly, no hearing was held in the instant proceedings at which the Court was required to testify.

Concerning any criminal trial/hearing involving Mother's conduct with respect to the instant custody proceedings, the Court notes that it has not been called to testify and, moreover, would not be presiding over such a matter in any event, making Rule 605 of the Pennsylvania Rules of Evidence – cited by Mother – inapplicable. See Pa.R.Evid.P. 605 ("The *presiding* judge may not testify as a witness at the trial or other proceeding." (emphasis added)).

*Second*, Mother contends the Court erred by entering the Recusal Order without holding a hearing. Notably, Mother did not request a hearing in her motion for recusal. She also never objected to the lack of a hearing until she filed her statement pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure. Accordingly, Mother has not properly preserved this allegation of error for appellate review. See Pa.R.A.P. 302(a) ("[i]ssues not raised in the

21

lower court are waived and cannot be raised for the first time on appeal"); see also Beemac Trucking, LLC v. CNG Concepts, LLC, 134 A.3d 1055, 1058 (Pa. Super. Ct. 2016) ("[a]n issue raised for the first time in a concise statement is waived").

The Court submits, therefore, that based on the foregoing, if the appeal at 245 WDA 2019 is not quashed, the Recusal Order should be affirmed. Mother's arguments are either waived or lack merit.

## IV. Conclusion

For the reasons set forth above, Mother's pending appeal should be quashed. In the event it is not, the Recusal Order should be affirmed.

BY THE COURT:

_____, J.
Susan Evashavik DiLucente

22